UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

LUIS CAMACHO,                           )
                                        )
                 Plaintiff,             )
                                        )
        v.                              )        Case No.  16-3317
                                        )
THE ILLINOIS DEPARTMENT OF              )
TRANSPORTATION,                         )
                                        )
                 Defendant.             )

**MEMORANDUM OF LUIS CAMACHO IN OPPOSITION TO
THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

In 2012 Luis Camacho ["Camacho"] had worked for the Illinois Department of

Transportation ["IDOT"] for ten years as a geotechnical engineer in its Bureau of Bridges and

Structures ["Bureau"].  Camacho, who holds a masters degree in geology, had spent his entire

career working in the Foundations and Geotechnical Unit ["Unit"].

During much of that time period, he received fully satisfactory performance evaluations,

was considered competent to perform the technical work of the Unit and received two

promotions.

In 2012 he began experiencing the symptoms of a mental illness that included anxiety

and panic attacks.  He was diagnosed with Bipolar Affective Disorder, Type 2.  Although not

aware of his precise diagnosis, his supervisory chain of command was aware that he suffered

from a mental illness.

Coinciding with his diagnosis, Camacho perceived that his supervisors were treating him

differently and less favorably than they had prior to that time.

On October 23, 2013 Camacho filed a charge of discrimination with the Illinois Department of Human Rights ["Department"].  After that filing the treatment Camacho received from IDOT became much worse.  IDOT:  1) began scrutinizing to a much greater degree his tardiness; 2) failed to assign him work; 3) raised issues with him concerning petty matters; and 4) ignored his requests for reasonable accommodations because of his disability.

In March of 2014 he requested an accommodation that he be temporarily transferred to another area away from the stressors in the Unit until his medical condition stabilized.  Although IDOT's policy was to respond to such requests within thirty days, it ignored his request.

In late July of 2014 Camacho was placed on administrative leave.  Later, he underwent a fitness for duty evaluation performed by a psychiatrist selected by IDOT.  The evaluation concluded that Camacho was not fit for duty.  For fourteen months he was away from work and during much of that period received a disability benefit equal to ½ of his salary.

In the spring of 2015 Camacho's psychiatrist and clinical psychologist felt he was fit to return to work, but not to the position he held in the Unit.  Later, the psychiatrist who had earlier evaluated Camacho for IDOT agreed.

Although a geologist position outside of the Bureau was available, Camacho was without explanation passed over for that position.  Instead, he was given only one option, a clerical position in IDOT's central sign shop.  Although he experienced no cut in pay, the salary scale in that position was lower and Camacho would receive no salary increases while in that position.  Moreover, the work in that position was significantly less fulfilling than his work as a geologist.

In the wake of the foregoing events Camacho initiated the above case.  He advances two separate claims.

In the first (Count I) he alleges that after he filed his charge of discrimination with the Department IDOT in a variety of ways acted out against him.  He further claims this conduct aggravated the symptoms of his mental illness leading to his disability leave.  He claims IDOT's conduct violated his rights under the "Americans With Disabilities Act" ["ADA"] (42 U.S.C. § 12203) and Title VII of the "Civil Rights Act of 1964" ["Act"] (42 U.S.C. § 2000e-3).

His second claim (Counts II and III) relates to his assignment to the sign shop at the end of his disability leave.  In Count III he claims that IDOT did not reasonably accommodate him in violation of the ADA [42 U.S.C. § 12112].  In Count III he claims that the sign shop assignment was retaliatory because of his earlier charge of discrimination in violation of both the ADA [42 U.S.C. § 12203] and the Act [42 U.S.C. § 2000e-3].

IDOT now seeks summary judgment contending that Camacho's claims are for several reasons not worthy of a trial.

With respect to Camacho's retaliation claim, it asserts:  a) the treatment Camacho complains about began before he filed his charge of discrimination, arose because of his frequent absences from work and he was treated the same as other employees; b) its reassignment to the sign shop was the product of an accommodation he requested; and c) Camacho did not suffer any adverse employment action.

With respect to Camacho's claim that IDOT failed to provide him a reasonable accommodation, it asserts that:  a) Camacho was not a qualified individual with a disability; b) it provided him a reasonable accommodation to the request he made in March of 2014; and c) Camacho failed to engage in an interactive process to find a reasonable accommodation.

For reasons which follow the record developed in this case has plentiful evidence

undermining IDOT's contentions.  Its request for summary judgment should be denied.[1]

## II.  STATEMENT OF FACTS[2]

### A)  The Defendant's Facts

#### 1)  Material facts which are undisputed.

With respect to the material facts claimed to be undisputed by IDOT, Camacho agrees that the following facts are undisputed and material except as otherwise shown:  1,2,3 (except that there was also a contractual worker), 4,5,6 (only to the extent he was treated differently and less favorably), 8 (except that it became most severe in 2014), 9 (to the extent it refers to portions of the workday rather than the entire workday), 10,11,12, 13,17, 18,19,20,21,22,23 (only to the extent Dr. Ferguson saw Camacho and determined that he was not fit for duty), 24,25,26,27,28,29,30,31,32,33 (only to the extent that beginning in the summer of 2015 IDOT informed Camacho's lawyer of some possible positions for Camacho;  ¶90 Camacho Statement), 37, and 38 (only to the extent IDOT assigned Camacho to that position).

#### 2)  Material facts which are disputed.

With respect to IDOT's statement of material facts, Camacho disputes:  7 (¶¶34, 41, 54, 55, 56, 57 Camacho Statement), 14 (¶¶43, 46, 47 Camacho Statement), 15 (¶45 Camacho Statement), 17 (¶72 Camacho Statement),  34 (¶¶89-103 Camacho Statement), 35 (to the extent it asserts Camacho did not want a position in the Bureau of Materials and Physical Research; ¶97 Camacho Statement), 36 (¶¶91-96 Camacho Statement), 38 (to the extent Camacho "accepted"

---

[1]Camacho submits with this instrument an appendix consisting of deposition transcripts and exhibits, the affidavit of Carl Draper and documents received through discovery from IDOT.

[2]  As used in this document, the term "Camacho Statement" refers to Camacho's statement of undisputed facts which is contained later in this section.

the position.  He was told it was the only position he would be offered; ¶103 Camacho

Statement), 39 (¶¶89-103 Camacho Statement), 40 (to the extent IDOT could not offer Camacho

a temporary transfer; ¶¶69, 77, 78 Camacho Statement), and 41 (¶¶69, 77, 78, 93 Camacho

Statement).

### 3)  Facts which are immaterial.

Camacho asserts that the following facts are irrelevant to the resolution of any material

issue in the instant summary judgment proceeding:  12 and 16.

### 4)  Facts which are objectionable.

Camacho objects to:  23 (on foundation grounds.  Dr. Ferguson would have no

knowledge concerning Camacho's behavior in the workplace).

### B)  Camacho's Facts

**The Cast of Characters**

1.    William Kramer ["Kramer"] headed the Unit from 2002 to 2017 [Kramer Dep.4-5].

2.    In 2012 Brad Hessing ["Hessing"] who worked in the Unit was promoted to group leader
      [Hessing Dep.7-9].

3.    In July of 2005 Carlos Ramirez [Ramirez"] was the Chief of IDOT's Civil Rights Bureau
      and the ADA coordinator.  David Dailey preceded Ramirez in that position [Ramirez
      Dep.6-7].

4.    Michael Prater ["Prater"] worked for IDOT in the Office of Chief Counsel [Prater
      Dep.4,7-8].

5.    Brian Johnson had personnel responsibilities for the Bureau [Prater Dep.13-14].

6.    In 2014 Dianna Taylor ["Taylor"] was Payroll and Benefits Manager at IDOT [Taylor

Dep. 7].

7.  In 2013 Edgar Galofre, Hessing and Camacho were co-employees in the Unit [Camacho Dep. 10-11].

**The Unit**

8.  The Unit was responsible for assisting other units in endeavors relating to bridge construction [Kramer Dep.4-5, Hessing Dep.10-11].

9.  The work of a geotechnical engineer and a Geologist III in the Unit is much the same. The bulk of the work involved reviewing plans, reports and designs [Hessing Dep.10, 67].

10. After Hessing was promoted to group leader the number of employees doing the production work was reduced to two.   However, the work load in the unit increased. There was also a female contract worker in the Unit who performed the same type of work as Camacho and Galofre [Kramer Dep.11, Hessing Dep.23-24].

11. As group leader Hessing supervised Camacho and Galofre.  He assigned and reviewed their work [Hessing Dep.21].

12. In the Bureau employees were allowed to come in late and make up the time at the end of the day [Camacho Dep. 46-47].  While Kramer headed the Unit he allowed employees to make up time at the end of the shift [Hessing Dep.30].

**Camacho's Employment History with IDOT**

13. Camacho has both a bachelor's degree in geology and a master's degree in geological engineering.  His work experience was in that field [Camacho Dep. 6-7, 139].

14. Camacho was hired on June 3, 2002 by IDOT as a Geologist I.  On July 1, 2005 he was

promoted to a Geologist II.  On July 16, 2007 he was promoted to a Geologist III [Pl.Ex.4 at question 5, Camacho Dep.8-9].

15.    Camacho worked in the Unit with Kramer for 12 years.  The type of work Camacho performed in the Unit was both consistent with his professional background and professionally fulfilling [Camacho Dep. 139-140].

16.    There was no difference in the work type Camacho was assigned in 2004 and what he was assigned in 2011 and 2012 [Kramer Dep.15-16].

17.    In the performance evaluations Camacho received prior to June 30, 2013 for fiscal years 2005, 2006, 2007, 2009 and 2011 his performance was rated as fully satisfactory. Moreover, it was not noted in any of those reviews that Camacho lacked the technical skills necessary to perform the work required of him in the Unit [Kramer Dep.20, Group Ex.10].

18.    According to Kramer when Hessing became Camacho's supervisor the relationship was initially good, but turned negative.  Hessing had a tendency to internalize and get upset with Camacho and could not let go [Kramer Dep.27-29].

19.    In 2012 Dave Greifzu became Kramer's supervisor. He directed Kramer to stop allowing Camacho to take time off from work.  Before Greifzu became his supervisor Kramer never contemplated disciplining Camacho [Kramer Dep.32-33].

20.    Kramer prepared the July 1, 2012 to June 30, 2013 performance evaluation of Camacho. He knew Camacho during the time period it covered had medical issues which were exacerbated by the stress of marital issues and school issues with his children.  The stress was affecting his work.  It appeared to Kramer that Camacho's medications were not

working correctly.  He was different than he had been earlier in his career [Kramer Dep.33-36].

21.   The evaluation was signed by Hessing and Kramer on August 1, 2013, but it was not signed by Camacho until January 21, 2014.  Camacho had to file a grievance through his union to secure his evaluation.  The evaluation had been held at the direction of Kramer's supervisor and Johnson for over five months [Kramer Dep.38-39, Hessing Dep. 49, Group Ex.10].

22.   Hessing made the call on what projects to assign to Camacho after August 1st, 2013 [Kramer Dep.44-45].  Kramer believes that in 2013 and 2014 there was enough work in the unit to keep everyone busy  [Kramer Dep.45].

23.   In his last evaluation Camacho's production was characterized as lower than in the previous year because he was absent from work more frequently [Hessing Dep.61-62, Ex.11].  According to Hessing, Camacho was, nonetheless, normally able to complete his work within the required time frame [Hessing Dep.62].

**Camacho's Disability**

24.   In 2012 or 2013 Camacho was diagnosed with bipolar disorder [Camacho Dep. 28-29]. Because of his diagnosis Camacho experiences symptoms such as anxiety which lead to panic attacks where his heart felt like it was coming out of his chest and he could not move [Camacho Dep.130-131].  His symptoms began in 2012 and continued thereafter [Camacho Dep. 41-42].

25.   Camacho made an accommodation request in 2012 asking to move cubicles because the noise from co-employees was disturbing him. His request was allowed [Camacho Dep.

35-38, Ex.12].

26.     In August of 2012 Camacho requested accommodation for a work schedule modification and flexible leave policy. At that time he was not sleeping well because of anxiety and panic attacks which prevented him from getting out of bed. He was struggling to get to work on time [Camacho Dep. 40-41, Ex.12]. Camacho requested flexible work hours so he would not have to use benefit time. He hoped IDOT would grant an accommodation so he would not have to use leave time. His accommodation request was not granted [Camacho Dep. 52-53, Ex.12].

27.     Camacho requested a flex schedule because if he arrived five minutes late he would be reminded that tardiness was subject to discipline [Camacho Dep. 57-58].

28.     Beginning in late 2012 Camacho had to go to his counselor two to three times a week, sometimes in the middle of the day, due to panic attacks [Camacho Dep. 47-48].

29.     When Camacho was having anxiety issues he used FMLA time and benefit time to cover his absences. Once his benefit time was exhausted he was not paid during absences [Camacho Dep. 51-52, Ex.14, 15].

30.     Camacho's attendance problems were due to his depression [Camacho Dep. 43-44. Ex.12].

31.     Others in the Bureau supervised by Greifzu were allowed to work extra at the end of the day. Tim Craven in the planning unit was one [Camacho Dep. 58-59].

32.     Camacho's tardiness was not worse than anyone else on the unit prior to 2012 [Camacho Dep. 42].

33.     Kramer kept track of time in 2012 and 2013 [Camacho Dep. 45].

34.  Camacho was singled out by monitoring his time when others without a disability did not have their time monitored [Camacho Dep. 45].

35.  On August 13, 2013 Camacho made a request for a reasonable accommodation from IDOT.  He noted that he suffered from bipolar affective disorder type 2 with a "mainly depressed mood."  He requested a work schedule modification and a flexible leave policy.  In explaining his request Camacho indicated that anxiety and depression made is hard for him to get out of bed and he usually stayed in bed "frozen" with anxiety not being able to get up.  He indicated this was becoming a more normal situation.  He noted that he had been labeled, due to his condition, a malingerer and challenger of the system by coming to work late [Ex.12].

36.  On August 23, 2013 Kramer informed Johnson that Camacho had a "flare up" the previous day and had to leave his work station for 45 minutes.  Kramer recommended to Johnson that he should be allowed to take the time without pay since he had a "serious genuine condition" and is attempting to secure an FMLA approval.  Johnson replied that the absence should not be signed off as authorized and the situation "would be a valid case of an unauthorized absence."  He was informed not to approve Camacho's leave slip [Ex.35].

**Camacho's Work Environment Following his 2013 Charge of Discrimination**

37.  On October 23, 2013 Camacho filed a charge of discrimination against IDOT with the Illinois Department of Human Rights ["Department"].  He claimed that he had been prohibited from taking time off for medical and personal reasons, been subjected to harassment and subjected to unnecessary disciplinary action because of either his

Hispanic ancestry or his disability [Camacho Dep. 18-19, Pl.Ex.24].

38.  If an employee complains about treatment from a supervisor in a discrimination charge to the Department his supervisor is interviewed by IDOT [Ramirez Dep.18].

39.  Kramer was aware Camacho made a discrimination claim [Kramer Dep.67-68]. He answered questions via telephone for the Department while Camacho was still working in the Unit [Kramer Dep.68-69].

40.  After Camacho filed his civil rights complaint in 2013 he began being assigned less work. Camacho communicated the idleness to Hessing by sending reports on his work assignments. When he reported he had little work Hessing normally told Camacho not to bother him. Camacho stopped telling Hessing he did not have enough work when he got no results. During this time Hessing continued to assign work to both Galofre and the contractual worker [Camacho Dep. 90-94].

41.  Initially, Kramer did not consider Camacho tardy if he came in a minute or two late and covered the time at the end of the day. Greifzu and Johnson later told Kramer being tardy was a problem, directed him to no longer accept tardiness and to document Camacho's tardiness [Kramer Dep.75-77, Ex.32].

42.  Although Camacho had earlier been allowed to move to a different work station, he was later required to return to his old work station without explanation at the direction of Greifzu [Camacho Dep. 66-67].

43.  Late in the year 2013, Carl Draper began representing Camacho [Draper Affidavit ¶2, Camacho Dep. 53, Ex.12]. On December 18, 2013 Draper on Camacho's behalf requested some accommodations because of Camacho's disability. The most important

of these was that he be allowed a 30 minute window at the beginning of each day for flex

time in the event he is having a medical problem making it difficult for him to get to

work by the normal starting time [Draper Affidavit ¶6,  Ex.A ].

44.    At that time, Camacho's supervisors were concerned about his frequent tardiness.  Draper

understood that his tardiness was attributable to his medical condition and believed that

the requested accommodation would address the tardiness problem which was occurring

because of Camacho's medical condition [Draper Affidavit ¶7].

45.    In late December of 2013 Camacho began calling in to notify Hessing or Kramer if he

would be late [Camacho Dep. 78-79, Ex.12].  According to Hessing Camacho was

normally good about calling in when he would be late [Hessing Dep.39-40].

46.    While representing Camacho Draper was his spokesman in dealing with IDOT officials

concerning Camacho's employment issues that included his requests for reasonable

accommodation and his effort to return to work for IDOT in the summer of 2015.  With

respect to each of those issues, Draper was always willing to meet and confer with IDOT

concerning both matters.  Neither Mr. Camacho nor Draper  ever refused to interact with

the IDOT officials concerning these matters .  Draper focused on Camacho's disability

claims that were not being accommodated.  Camacho and Draper sought a meeting with

Daly for assistance.  With his help one meeting was obtained with IDOT officers.  They

continually attempted to obtain cooperation from IDOT officials which was difficult to

obtain [Draper Affidavit ¶4].

47.    On the morning of April 3, 2014 Kramer sent an email to Camacho telling him that his

accommodation request had not yet been allowed [IDOT Doc.No.005351].   In a

responsive email to Kramer and David Daley, Camacho requested that Daley "please" let him know when his request for an accommodation would be granted [IDOT Doc.No. 005350].   It was not until April 9, 2014, over 100 days after Draper made the request, that this accommodation was granted [IDOT Doc.No.005344].

48.   In January of 2014 Hessing knew that Camacho was seeking treatment for personal problems and was aware Camacho was on medication [Hessing Dep.40].

49.   Camacho was involved in an incident with Hessing on January 31, 2014.   He had arrived at work late that day after a bad night.   He had tried to call, but Hessing's phone was busy.   He left a message with Galofre that he would be late who passed it along to Hessing.   Thinking that Camacho had not attempted to notify him he would be late, Hessing became upset [Hessing Dep.34-36].   Hessing directed Camacho to go to the hallway which he did.   While Camacho was leaning against the wall,   Hessing put his hand near Camacho's ear, almost touching him.   Hessing berated Camacho for not calling him while pointing his finger in Camacho's face [Camacho Dep. 76-78].   They were about two feet apart.   Hessing is a bit over 6 feet tall and weighed around 250 pounds. Camacho is around 5'9".   Hessing acknowledged that he was angry [Hessing Dep.37-39].

50.   Camacho felt threatened by Hessing and believed that Hessing was in his personal space. Camacho had never seen Hessing get upset with any of his co-workers.   [Camacho Dep. 80-81].

51.    On February 3, 2014 Camacho by email informed Kramer about his concerns regarding Hessing's conduct [Pl.Ex.9].

52.   In 2014 Camacho displayed symptoms to Hessing which caused him to believe Camacho

had a mental illness.  According to him, Camacho's symptoms were becoming worse.  It appeared to Hessing that Camacho was having a rough time [Hessing Dep.43-44, Ex. 1].

53.   On June 10, 2014 Kramer reprimanded Camacho for eating in his work cubicle even though that was something that Kramer himself regularly practiced [IDOT Doc.No.005894].

54.   On June 20, 2014 Camacho was two minutes late to work according to Kramer's computer.  Camacho believed he was 30 seconds late and wrote 8:00 on the time sheet. Kramer noted on the time sheet 8:02 [Kramer Dep.84-85, Ex.33-34]. On that day Kramer informed Hessing that Camacho signed in that morning indicating he was there at 8 a.m. when according to Kramer's computer the actual time was 8:02 a.m.  Kramer made a point of putting the designation "8:02 wmk" next Camacho's entry.  Kramer noted that Camacho got upset when he saw it [IDOT Doc.No.005342].

55.   According to Kramer, by the time of that incident there was now an intense scrutiny of Camacho's time [Kramer Dep.85-86].  According to Kramer, the average employee was not under that scrutiny and it bothered Camacho [Kramer Dep.86-87].  Kramer would not have corrected the time sign in for other employees.  He was directed by his supervisor to document the exact time for Camacho only.  This scrutiny of Camacho increased over time until Camacho took administrative leave [Kramer Dep.87, 91-92,  Ex.33-34].

56.   Between July of 2013 and February of 2014  Kramer was tardy 13 times.  Hessing was tardy 24 times and Garfole was tardy 8 times [Kramer Dep.104-105, Group Ex.36].

57.   Kramer received no warnings or discipline for tardiness.  Kramer spoke with Hessing about being late and that as a supervisor it was a problem.  According to Kramer there

were a lot of days Hessing was very late.  Unlike Camacho, Hessing lived close to work
and had no medical issues [Kramer Dep.105-106].

58.  In 2014 Camacho was on proof status.  Johnson required that any leave slip of Camacho
had to be accompanied with a medical slip. That requirement did not apply to others in
the Unit [Kramer Dep.109-110].

59.  At one point Kramer accused Camacho of falsifying the time he reported to work and
stated it would be reported to investigators.  Camacho was also accused of falsifying
Kramer's signature on the sign in sheet [Camacho Dep. 98-99].

60.  On July 9, 2014 Camacho asked Hessing why he was not assigned some work that had
recently been received in the Unit.  In response Hessing indicated that Camacho had
other responsibilities and "please don't waste time worrying about what has or has not
been assigned to you" [IDOT Doc.No.005889-890].

61.  From January 2014 to July 2014 when Camacho was placed on administrative leave he
was receiving fewer work assignments [Camacho Dep. 61-62].

**Camacho's March, 2014 Request for an Accommodation**

62.  On March 20, 2014 Camacho requested a reasonable accommodation.  He indicated he
suffered from bi-polar II disorder, severe depression, anxiety and panic attacks.  He
requested a temporary transfer to a new position that involved different assignments,
responsibilities and supervision which would allow him time to develop strategies and
techniques for managing the symptoms of his condition [Camacho Dep. 84-85, Pl.Ex.1].

63.  A move to a different area would allow the treatment at work to cease while he was being
treated for his illness.  Camacho wanted to be moved temporarily for six months

[Camacho Dep. 85, Ex.1].

64.  At that time, Camacho was suffering from symptoms of anxiety and

panic attacks.  The idea of a temporary transfer was to enable him to work temporarily in

an environment where he did not have the stressors he was experiencing in his present

assignment while he was being treated for those symptoms [Draper Affidavit ¶8].

65.  Camacho forwarded the request to JP Fyans, the lawyer for his union who agreed it was a

good idea.  Fyans approved it so long as it was a temporary transfer [Camacho Dep. 88-

89, Ex.1].

66.  When Camacho requested the temporary assignment his marital and financial problems

were behind him.  However, his symptoms were getting worse.  He had anxiety and panic

attacks every morning.  He wondered what would happen at work each day.  His work

assignments had decreased by 40 percent.  Accordingly, he was often idle at work.  He

became anxious and worried because he had no work [Camacho Dep. 133-134].

67.  Under his former supervisor Camacho had no times of idleness.  By March of 2014

Camacho might have a week of idleness.  Sometimes Camacho was waiting for Hessing

to finish his review of Camacho's work before being given a new assignment.  It was

stressful.  When Camacho was busy at work it helped him deal with his symptoms.  He

could focus on work and not think about other things.  He became upset when he was idle

[Camacho Dep. 135-137].

68.  Camacho's request for a reasonable accommodation was presented to Kramer who

passed it along to his supervisor [Kramer Dep.51-52, Ex.1, 26].  Kramer recommended

that the request for a reassignment to a vacant position be allowed.  He thought it

reasonable and noted that Camacho "is ill and keeping him in this stressful environment is not helping him or us."  Carl Puzey, the head of the Bureau, recommended its approval as well.  These recommendations were made on March 21, 2014 [Pl.Ex.26].

69.     Transfers at IDOT are regulated by the collective bargaining agreement [Taylor Dep. 14]. The collective bargaining agreement covering Camacho's position during the time period between July 1, 2012 and June 30, 2015 contained no provision limiting IDOT from making a temporary transfer of an employee.  Under Article IV of that agreement IDOT reserved the right to direct its work force including the right to transfer, assign and direct its covered employees [Agreement between General Teamsters/Professional & Technical Employees Local Union No. 916 and IDOT at 002042 to 002092].  Article XV Section 1c) provides that IDOT may temporarily fill a vacancy [at 002072].

70.     Under IDOT policy it is supposed to respond to an accommodation request within thirty days.   If IDOT cannot accommodate the request IDOT will talk with the employee and might request additional information from a physician.  It is an interactive process for reasonable accommodation. The employee is provided a written response on whether the request is allowed or denied [Ramirez Dep.11-13].

71.     Kramer understood that Camacho suffered from bipolar disorder.   Camacho was open about being ill and needing an accommodation.  While Kramer does not know what bipolar disorder is, he understood it to be a mental illness.  Camacho told Kramer that he suffered from panic attacks, severe depression and anxiety.  Kramer felt that Camacho was almost angered by the lack of accommodation. [Kramer Dep.52, Ex.1, 26].  Kramer was also aware that Camacho was being treated on a weekly basis for his condition

because he signed his leave slips [Kramer Dep.54-55].

72.   Between March 20 and July 30, 2014 Kramer believed that Camacho was feeling that he

       had been persecuted and treated unfairly [Kramer Dep.66-67].

73.   Camacho remained in the Unit until he was placed on administrative leave.  Kramer does

       not know what happened with Camacho's request [Kramer Dep.56].

74.   Prater does not know whether the collective bargaining agreement covering Camacho

       prohibited a temporary transfer or reassignment [Prater Dep.18].

75.   Once he submitted his request for accommodation in March of 2014 Camacho received

       no response from IDOT between March 20, 2014 and the date he was placed on

       administrative leave [Camacho Dep. 130, Ex.1].  Camacho does not know what happened

       to his request.  He had no follow up conversations with anyone at IDOT about his request

       [Camacho Dep. 87-88.  IDOT acknowledged that Camacho's request was not resolved

       prior to his administrative leave [Ramirez Dep.61].

76.   Between March 20, 2014 when Camacho made his temporary transfer request and July

       30, 2014 neither Prater, Daley nor any other IDOT employee ever contacted Draper

       concerning Camacho's accommodation request. Camacho remained in the position he

       had been in throughout the course of his employment for IDOT [Draper Affidavit ¶9].

77.   Draper was never informed by any IDOT official that IDOT could not grant Mr.

       Camacho a temporary transfer until September of 2015 when he was assigned to work in

       the IDOT sign shop [Draper Affidavit ¶10].

78.   According to Draper, Camacho's union was receptive to the idea of IDOT granting him a

       temporary transfer as he had requested [Draper Affidavit ¶11].

**IDOT's Removal of Camacho from Active Employment**

79.   On July 30, 2014 IDOT informed Camacho that he was being placed on paid administrative leave immediately.  He was instructed to remain available by telephone during normal business hours and was forbidden to enter upon IDOT property without prior approval.  He was informed that his failure to comply with these conditions would subject him to disciplinary action [Pl.Ex.17].

80.   After placing Camacho on administrative leave, IDOT requested Terry Killian, M.D., a psychiatrist, to conduct a fitness for duty evaluation of Camacho.  To assist in that evaluation IDOT provided Killian with several hundred pages of documents consisting largely of email communications between Camacho and his supervisors.  On October 31, 2014 Killian issued his report.  He concluded that Camacho suffered from severe depression which was probably associated with bi-polar mood disorder.  He also opined that Camacho had a possible anxiety disorder (p.27).  He opined that Camacho at the time of evaluation was not capable of working.  He also recommended that when Camacho was fit to return to work he be transferred to a different IDOT workplace.  He reasoned that both Camacho and his supervisors contributed to making his work environment worse and the bad feeling between them was such that it would not be possible to rebuild a mutually respectful working relationship [October 31, 2014 Killian Report at pp.27, 38-39].

81.   In conducting his evaluation Killian requested that IDOT provide him with Camacho's performance reviews.  He noted that the August 1, 2013 performance evaluation was the first "significantly negative evaluation."  He noted that the evaluation referred to

"continuing problems" with the quality of Camacho's work, but his prior performance evaluations had not been critical of the quality of Camacho's work [October 31, 2014 Killian Report at p.31].

82.     It was the view of Killian that Camacho's supervisors were excessively picky (citing as examples making a big issue out of him being a minute or two late to work, criticizing him for being at his desk too early and eating at his desk).  He stated:  "All of this seems to me like a pretty silly way to treat a man with a masters degree in engineering who has demonstrated more than adequate competence (as per his performance evaluations the first few years)" [October 31, 2014 Killian Report at p.38].

83.     Camacho remained on administrative leave with pay until around November 14, 2014. On that date he went on non-occupational disability leave through the State Employees Retirement System where he received half pay until he returned to work on October 1, 2015 [Camacho Dep. 25-26].

**Camacho's attempt to Return to Work**

84.     In 2014 and 2015 Camacho was treated by Keith Buescher, Ph.D., a clinical psychologist.  On May 20, 2015 Dr. Buescher released Camacho to return to work "only if transferred to another position away and separate from current position."  Dr. Buescher indicated that Camacho could not work under the same job stress, supervision or work climate [Group Ex.13 at bates 001612, IDOT Doc.No.001612].

85.     Camacho's psychiatrist also cleared him to return to work in May of 2015 [Camacho Dep. 26].

86.     On July 17, 2015 Killian conducted a follow up fitness for duty evaluation of Camacho at

the request of IDOT.  He concluded that Camacho suffered from bi-polar mood disorder, type II, and possible anxiety disorder.  He opined that Camacho was fit to return to work but "strongly recommended" that Camacho return to work in a different bureau at IDOT. He believed that if Camacho were to return to his previous workplace the relationship between Camacho and his supervisors would make it unlikely that they could rebuild a productive working relationship and it was "much more likely that Mr. Camacho and the supervisors would end up spending a great deal of their time documenting each other's behavior rather than focusing on the important work that the State of Illinois needs IDOT to do" [Group Ex.13].

87.   Although Camacho was found fit for duty in July of 2015 he was not returned to work until October 1, 2015 [Camacho Dep.27].  After being found fit for duty he was never returned to administrative leave status while waiting for a position being found for him [Camacho Dep. 108-109, Ex.2].

88.   After both Camacho's physicians and the IDOT physician determined Camacho was fit to return to work, Prater was involved in locating a position for Camacho [Prater Dep.26].

89.   In the summer of 2015 Draper had conversations with Prater about the position Camacho would return to with IDOT.  Because he had a masters degree in geology and over 12 years of geotechnical work experience with IDOT, Camacho and Draper hoped that a position could be located that would allow him to utilize his education and experience [Draper Affidavit ¶14].

90.   Prater sent job descriptions to Draper for a sign shop position in District 6, a Geologist III

position in District 6 and a job in the Bureau of Materials and Physical Research [Prater Dep.31-32, Ex.20].

91. In an email written on May 26, 2015 Johnson noted that a geologist III position was available in District 6 because an employee was on leave.  He noted that was an option for assigning Camacho and would satisfy the recommendation of his physician [Ex.27].

92. The District 6 geologist position had been held by someone who was on suspension that never returned to work. Prater does not know who was performing the duties of the position while the employee was gone [Prater Dep.45-46].

93. On August 20, 2015 Prater contacted Draper and informed him that he had located a position for Camacho as a geologist in the District 6 Office of IDOT.  It was a position in the same bargaining unit as Camacho's former position.  Prater indicated that the only contingency for him being assigned that position was the need to secure permission from the Special Master who was monitoring, among other things, job transfers to ensure that they were not motivated by partisan political considerations.  Prater indicated that under the circumstances he did not view that as a problem.  At no time thereafter did either Prater or any other IDOT official ever inform Draper that either the District 6 position was unavailable or that Camacho was not suited for the position [Draper Affidavit ¶16].

94. Draper informed Camacho and his union representative that Prater had confirmed to Draper that Camacho would be reinstated in a geologist position in a different building.  He told them Prater said that he "has other work to do with Personnel on this but sees no problems" [Ex.19, 20, 28].

95. Although IDOT claims Camacho was not a good fit for the District 6 position because it

had several direct reports, Prater never investigated who was supervising the subordinate employees while the position was vacant [Prater Dep.54]. Prater does not believe anyone talked to any personnel officer in District 6 about the position. What Prater knew about the supervisory duties is only what were listed in the job description [Prater Dep.69-70].

96.    At the time Camacho was assigned to the sign shop, the District 6 Geologist position remained open [Prater Dep.53].

97.    On August 21, 2015 Prater forwarded Draper a position description for a quality assurance geologist position in the Bureau of Materials and Physical Research. Draper never informed Prater or anyone else at IDOT that Camacho would not accept that position [Draper Affidavit ¶15].

**Camacho's Assignment to the Sign Shop**

98.    On August 28, 2015 Prater sent Draper a position classification for an engineering technician III position in IDOT's Central Sign Shop. That was the first communication Draper ever received from IDOT concerning the sign shop position [Draper Affidavit ¶17].

99.    In 2015 Camacho was classified as a Geologist III. It was a position in the Teamster's bargaining unit [Taylor Dep. 43].

100.   Taylor was asked to look for vacant positions with a similar pay grade to Camacho's current pay grade and pass that information along to Prater [Taylor Dep. 35-36]. The database identified open positions. It did not list any open positions in the Bureau of Operation which included the sign shop. The sign shop position was not posted to be filled at the time Camacho was assigned to it and no other people applied for the position

[Taylor Dep. 38-39, 44-45, Ex.6 and 21].

101. Between August 31, 2015 and October 31, 2015 there were five open positions posted that Camacho met the qualifications for and was eligible to hold [Ramirez Dep.52-53, Ex.4 at page 2240].

102. Prater participated in a telephone conversation on September 16, 2015 with Ramirez and Draper to make the sign shop job offer.  It was explained to Draper that the sign shop position was the last option that was available to Camacho [Prater Dep.68, Ex.2].

103. Draper was informed at that time (mid September) that IDOT was assigning Camacho to its sign shop.  Prater explained to Draper that the sign shop position was the only one that would be offered to Camacho.  No explanation was given to Draper about why the District 6 geologist position was not being given to Camacho [Draper Affidavit ¶18].

104. On September 23, 2015 Ramirez informed Draper that IDOT was denying Camacho's March 20, 2014 accommodation request claiming that it could not grant a temporary transfer, but was giving him a permanent transfer to the sign shop as an ET III [Pl.Ex.2].

105. An ET-III is an engineering technician III.  It is in a lower classification than a geologist. The upper level of the pay scale for the ET-III position is lower than a geologist III. [Prater Dep.55].

106. On September 29, 2015 IDOT sent a letter to Camacho directing him to report to IDOT's Central Sign Shop on October 1, 2015.  Although it indicates on its face that the assignment is in response to his request for a reasonable accommodation, the accommodation he requested was made on March 20, 2014, over 18 months earlier.  The sign shop position was never an accommodation requested by or on behalf of Camacho

[Draper Affidavit ¶20].

107.   Camacho accepted the sign shop position because he would have been dismissed if he had not gone to the sign shop [Camacho Dep. 109-110].

**Camacho's Work in the Sign Shop**

108.   The construction signs used by IDOT are ordered through the sign shop.  Camacho becomes involved as the signs are leaving the shop.  He adds the number of signs and amount to a spreadsheet.  He verifies the orders are complete and accurate. Camacho also creates and maintains a database and verifies orders from the districts  [Camacho Dep. 12-15].

109.   As a Geologist III Camacho was not at the highest point in his salary scale.  When he went into the sign shop Camacho's job classification was lower than a Geologist III. While his salary was not reduced, he was at the top of the scale in his new position [Camacho Dep. 137-138].  Camacho would have received pay increases as a Geologist III.  He would not see pay increases as a ET III [Camacho Dep. 116-117].

110.   The work in the sign shop does not require training in geology or geotechnical engineering.  The work is not professionally fulfilling and has affected Camacho's self-esteem [Camacho Dep. 140].

111.   The sign shop position hinders Camacho's ability to get a geotechnical position because he has been away from that work since 2014 [Camacho Dep. 114-115].

112.   Camacho wants to return and do work similar to his education and experience.  His self-esteem has gone down working in the sign shop. He has become depressed again. He is taking medication for mental health issues [Camacho Dep. 120-121].

### III.  STANDARDS WHICH ARE APPLICABLE
### IN A SUMMARY JUDGMENT PROCEEDING

Rule 56 of the *Federal Rules of Civil Procedure* provides that a motion for summary judgment shall be granted only if the pleadings, depositions, answers to interrogatories and admissions on file together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law [*Celotex v. Catrett*, 477 U.S. 317, 91 L.Ed.2d 265 (1986)].

Summary judgment is only appropriate when the record reveals that no reasonable jury could find for the non-moving party [See *Karazanos v. Navistar International Transportation Corp.*, 948 F.2d 332 (7th Cir.1991); *Konowitz v. Schnadig Corporation*, 965 F.2d 230 (7th Cir. 1992); *Anderson v. Stauffer Chemical Company*, 965 F.2d 397 (7th Cir.1992); and *McCoy v. WGN Continental Broadcasting Company*, 957 F.2d 368 (7th Cir.1992)].  It is proper only if there is no reasonably contestable issue of fact which is potentially outcome determinative.  Rule 56 was not intended to permit a summary judgment proceeding as a substitute for a trial [*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396-97 (7th Cir.1997)].

In a summary judgment proceeding the facts and inferences drawn from underlying facts must be viewed in a light most favorable to the party opposing the motion [See *United States v. Diebold, Inc.*, 369 U.S. 654, 8 L.Ed.2d 176, 82 S.Ct. 993 (1962); and *Matsushita Electric Industrial Company, Ltd., et.al. v. Zenith Radio Corporation*, *et.al.,* 475 U.S. 574, 89 L.Ed.2d 538, 106 S.Ct. 1348 (1986)].

In a summary judgment proceeding, it is not the court's function to weigh the evidence

and determine the truth of the matter, but instead to determine whether there is a genuine issue for trial.  A Court should not determine whether the evidence unmistakably favors one side or the other, but to instead determine whether a fair minded jury could return a verdict for the party opposing the motion on the basis of the evidence presented [See *Anderson v. Liberty Lobby, Inc.* (op.cit.1985); and *Shager v. Upjohn Company*, 913 F.2d. 398 (7th Cir. 1990)].  If evidence is subject to conflicting interpretations or if reasonable people might differ as to its significance summary judgment must be denied [See *Egger v. Phillips*, 669 F.2d 497 (7th Cir. 1982); and *O'Connor v. Chicago Transit Authority*, 985 F.2d 1362 (7th Cir.1993)].

Summary judgment is only to be granted if the record before the court had it been the record of a complete trial would have entitled the defendant to a directed verdict [See *Sarsha v. Sears, Roebuck and Company*, 3 F.3d 1035 (7th Cir.1993); *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159 (7th Cir. 1994); *CSX Transport, Inc. v. Chicago & North Western Transportation Company, Inc.*, 62 F.3d 185, 188 (7th Cir.1995); and *Illinois Conference of Teamsters v. Steve Gilbert Trucking*, 71 F.3d 1361 (7th Cir.1993)].

When the story line of the parties diverge, a court must give credence to the one advanced by the party opposing summary judgment because the evidence must be viewed in the light most favorable to her [*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir.2016)].

## IV.  ARGUMENT

### A) Camacho 's First Claim of Retaliation

In his first claim Camacho contends that following the filing of his charge of discrimination on October 23, 2013 IDOT in a variety and acted out against him.  Its conduct aggravated the symptoms of his mental illness to the point were it was medically determined he

was unfit to work.

In a retaliation claim the"core question" is whether a reasonable jury could infer retaliation [*Castro v. Devry University, Inc.* 786 F3d 559, 564 (7th Cir. 2015)].

Camacho may survive summary judgment under the direct method by presenting direct or circumstantial evidence that:        1) he engaged in a protected activity; 2) he suffered an adverse employment action; and 3) a causal connection between the two exists [*Poullard v. McDonald,* 829 F3d 844, 856 (7th Cir. 2016); and *Samuelson v. Durkee/French/Airwick*, 976 F2d 1111,114-115 (7th Cir. 1992); and *Baines v. Walgreen Company*, 863 F3d 656 (7th Cir. 2017)].

## 1) Camacho's Protected Activity

It is undisputed that Camacho engaged in protected activity when he filed a charge of employment discrimination against IDOT with the Department on October 23, 2013 [¶37 of Camacho's Statement].

## 2) The Adverse Action

With respect to retaliation claims an adverse employment action is defined quite broadly [*Jaburek v. Foxx,* 813 F3d 626, 633 (7th Cir. 2016]. It is conduct which a reasonable employee would have found materially adverse.  In other words it would have discouraged a reasonable employee from making a claim of discrimination [*Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53, 165 L.Ed.2d 345 (2006)].

An action which might not be material adverse to a normal employee could reach that threshold for an employee with specific vulnerabilities [*Washington v. Illinois Department of Revenue,* 420 F3d 658 (7th Cir. 2005)].  In *Washington*, for example the denial of an employee's request for flex time to care for a child with developmental disabilities was considered a

materially adverse employment action even though it would not have been for 99% of other employees (p.662).

Like the plaintiff in *Washington* Camacho was particularly vulnerable. He suffered from bipolar affective disorder. Between 2012 and July 2014 his symptoms became progressively worse and were marked by panic attacks. Having nothing to do exacerbated his symptoms. Both Kramer and Hessing knew that Camacho was sick [¶36, 48, 52, 68, 71 of Camacho's Statement]. Kramer recommended that IDOT approve Camacho's March 2014 accommodation request noting that he "is ill and keeping him in this stressful environment is not helping him or us." [¶68 of Camacho's Statement].  Based on his observations of Camacho Hessing believed he had a mental illness and in 2014 his symptoms were getting worse [¶52 of Camacho's Statement].

The failure to assign Camacho work when work was available to him caused him to have periods of idleness. Having no work might be considered ideal to many employees. Not so with Camacho. When he was busy at work he could better deal with his symptoms. He could focus on his work and not think about things which elevated his stress. Being idle was stressful for him [¶10, 11, 22, 40, 60,61,66, 67 of Camacho's Statement].

Hessing's assault in January of 2014 caused Camacho to feel threatened. While this would be upsetting to a normal employee it was another stressor Camacho was exposed to when his stress tank was rapidly filling [¶49,50,51 of Camacho's Statement].

IDOT's indifference to Camacho's requests for accommodation were perhaps the most harmful acts on its part.

In December 2013 Draper on Camacho's behalf requested as an accommodation that Camacho be placed on a flex schedule. Camacho's tardiness problem was attributed to his

illness. According to him, he had difficulty getting out of bed in the morning because he was frozen with anxiety [¶35, 43, 44, 45 of Camacho's Statement]. A flexible work schedule would help to address Camacho's tardiness problem. It took IDOT over 100 days to respond to that request. During that time, the symptoms of Camacho's illness were getting worse and he was exposed to more stress because of the increasing scrutiny to his tardiness [¶47,54, 55 of Camacho's Statement].

IDOT's failure to respond or even acknowledge Camacho's March 20, 2014 accommodation request caused him real harm. The objective of his transfer request was to be removed temporarily from the stress of his work environment while he was attempting to bring the symptoms of his mental illness under control [¶62,63,64,65 of Camacho's Statement]. According to Hessing during this period of time the symptoms of his illness were getting worse [¶52 of Camacho's Statement]. Kramer too felt Camacho was ill. He believed Camacho was angered by IDOT's failure to grant his request and felt he was being persecuted and treated unfairly [¶¶68,71,72 of Camacho's Statement]. Over 130 days after Camacho made his request he was placed on administrative leave without responding to his accommodation request and later determined to be medically unfit to work. This resulted in Camacho being placed in a disability leave status where he effectively receive one half of the income he would have received had he remained on the job [¶¶70, 75, 76, 77, 78, 79, 83 of Camacho's Statement].

A reasonable jury could believe that if IDOT had timely responded to his request and temporarily placed him in another position while he was attempting to bring the symptoms of his illness under control, the decision to remove him from work would not have been made.

**3) The Connection**

A plaintiff demonstrates a connection between his protected conduct and the employer's adverse action by showing that "but for" his protected activity the adverse action would not have occurred. The connection may be shown through circumstantial evidence such as evidence that other employees were treated differently or that the employer's preferred reason for the adverse action was pretextual [See *Baines* at p.664; and *Coleman v. Donahoe,* 667 F3d 835, 858 (7th Cir. 2012)].

Admittedly, Camacho had complaints about IDOT's treatment toward him before he filed his charge. That was the reason for him going to the Department in the first place. However, following his charge the treatment got much worse.

For example, according to Kramer, Camacho's tardiness even though attributed to his mental illness placed him under intense scrutiny. Kramer's supervisors directed him to no longer accept Camacho's tardiness and document it [¶¶12, 19, 27, 30, 31, 34, 36, 41, 54, 55 of Camacho's Statement]. In contrast, Hessing was tardy 24 times between July of 2013 and February of 2014. Hessing had no medical issues, lived much closer to work than Camacho and many times was very late to work. Nonetheless, other than Kramer talking with Hessing, IDOT did nothing to address his tardiness problem [¶¶55, 56, 57 of Camacho's Statement].

Even though IDOT claims that there was plenty of work in the Unit to keep Camacho busy, inexplicably there were long periods of time when no work was assigned to him. Hessing ignored Camacho's requests for more work [¶¶10, 11, 22, 40, 60, 61 of Camacho's Statement].

Although IDOT's reasonable accommodation policies required it to respond to a reasonable accommodation request within 30 days, engage in interaction with the employee and respond in writing to the request [¶¶43, 47, 70, 76 of Camacho's Statement], it failed to so

engage with Camacho twice.

First, Draper in December 2013 requested a flex time arrangement because Camacho due to his illness was having trouble getting to work. It was over 100 days after Draper's request was made at the request was granted. In the interim Camacho was under increasing scrutiny because of his tardiness [¶41,43,47, 55 of Camacho's Statement].

Second, on March 20, 2014 Camacho requested as an accommodation a temporary transfer to another position. Notwithstanding its policy IDOT ignored the request. In the 133 days between the request and Camacho's administrative leave IDOT failed to respond or even acknowledge it [¶75, 76,77,78 of Camacho's Statement].  The employer's failure to follow its own employment policies is evidence of pretextual behavior on its part [*Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424, 427 (7th Cir. 1991);  *Rudin v. Lincoln Land Community College*, 420 F3d 712, 727 (7th Cir. 2005); *Coleman v. Donahoe,* 667 F3d 835, 858 (7th Cir. 2012); and *Baines* at p.664].

Camacho was placed on proof status requiring him to present a physician's statement when he was absent from work even though his medical condition was well known to Kramer and others in Camacho's chain of command [¶48, 52, 58 of Camacho's Statement].

Although Camacho had earlier been allowed to change his work station to escape distractions following his charge he was required to return to his old work station [¶42 of Camacho's Statement].

On March 20, 2014 Camacho requested as a reasonable accommodation to transfer to position with different supervisor while he was developing strategies for managing symptoms of his illness.  Notwithstanding IDOT's accommodation policy, it ignored his request. When placed

on administrative leave 133 days after his request IDOT had yet to respond to it. It offered no reason for its delay [¶75,76,77,78 of Camacho's Statement].  In September 2015 IDOT claimed for the first time that it"cannot grant a temporary transfer".  That statement is belied by the collective bargaining agreement covering Camacho's employment which permits IDOT to make temporary transfers. Moreover, Camacho's union was receptive to him receiving a temporary transfer [¶65,69,78 of Camacho's Statement].

Following the charge: 1) Hessing without provocation engaged in physically threatening behavior toward Camacho in January 2014 [¶49,50 of Camacho's Statement]; 2) Kramer made an issue about the time Camacho signed in to work in June 2014 when there was intense scrutiny on Camacho's tardiness; and 3) Camacho on June 10, 2014 was reprimanded for eating in his work cubicle even though that was something Kramer himself did [¶53, 54, 55 of Camacho's Statement].

Dr. Killian who evaluated Camacho at the request of IDOT characterizes Camacho supervisor as being excessively picky and "a pretty silly way to treat a man with a master's degree in engineering who has demonstrated more than adequate competence ..." [¶82 of Camacho's Statement].

The conduct described above began shortly after Camacho filed his charge in late October, 2013 and continued until he was placed on administrative leave on July 31, 2014.

### B) IDOT's Permanent Assignment of Camacho to the Sign Shop

In September of 2015 IDOT reassigned Camacho to its sign shop in a clerical position not requiring the use of his education and experience as a geologist having a masters degree in that field.

He advances two separate claims because of his reassignment. First, he argues that IDOT's reassignment was another act of retaliation because of the charge of employment discrimination he had earlier filed with the Department.  Second, he claims that IDOT did not reasonably accommodate his disability in violation of the ADA.

IDOT asserts are two preliminary reasons that neither claim has merit.

First, it argues that because he accepted the sign shop position he has waived any claim he might otherwise have had. This is a nonstarter. A waiver is a voluntary relinquishment of a right. In this case there was nothing voluntary about Camacho's acceptance. Draper was told that the sign shop position was the only one being offered to Camacho. In other words it was "take it or leave it".  If he left it, Camacho would be giving up a job he had held for over 12 years. He accepted the position because he would have been dismissed had he refused it [¶102, 103, 104, 107 of Camacho's Statement].

Second, without any supporting facts IDOT claims that Camacho had refused to participate in an interactive process to find an accommodation. At the very least this contention is disputed. It is apparent that after Dr. Killian determined Camacho was fit for duty, Draper communicated on Camacho's behalf with Prater concerning job possibilities. In none of those communications is there any evidence of any unwillingness on Camacho's part to engage in accommodation discussions with IDOT.  Draper asserts that as Camacho's representative he was willing to meet and confer with IDOT and neither Camacho nor he ever refused to interact with IDOT.  Rather, he found it difficult to secure cooperation from IDOT officials [¶46, 76, 77 of Camacho's Statement].  Contrary to IDOT's assertion Camacho never refused a job assignment proposed by it [[¶97 of Camacho's Statement].

**1) Camacho's Retaliation Claim**

    **a) The Adverse Employment Action**

An adverse employment action can occur in two respects which are relevant to Camacho's situation. First, it can be an action that changes the financial terms of one's employment. Second, it can be a change in an employee job duties that causes his skills to atrophy and reduce further her career prospects [*Barton v. Zimmer, Inc.*, 662 F3d 448, 453-454, 7th Cir. 2011); and *Alexander v. Casino Queen, Inc.,* 739 F3d 972, 980 (7th Cir. 2014)].

Although there was no immediate financial loss to him, Camacho's reassignment did implicate the financial terms of his employment. The sign shop position was in a lower salary grade than his geologist position. When reassigned to that position he was that the top of the salary scale and could advance no further. In contrast as a geologist to he was not at the top of the salary scale and could look forward to future salary increases [¶109 of Camacho's Statement].

Second, Camacho's education and work experience was in the professional field of geotechnical engineering. He had a masters degree and over 10 years of work experience in that profession. In the sign shop he was a clerk. His job involved none of the skills he had developed as a geologist [¶108,110, 111 of Camacho's Statement].  Without using them those skills would diminish. Inevitably, his professional opportunities in either geology or geotechnical engineering would significantly decline.

**b)   The Connection between Camacho's Charge and his Reassignment to the Sign Shop**

    In support of its contentions that there is no causal connection between the harms Camacho claims and his protected conduct IDOT asserts that the time span between the two is as

a matter of law too long to create a causal connection. It is true that the longer the time span is between the two events, the less likely a connection exists absent other evidence [see for example *Lalvani v. Cook County, Illinois,* 269 F3d 785, 790 (7th Cir. 2001)].  It is also true that by the calendar 23 months elapsed between the filing of Camacho's charge and the sign shop assignment.

However, there are two factual considerations which defeat IDOT's contention.

First, during over 14 months of that 23 month period Camacho was away from work and IDOT had no opportunity to act out against him.

Second, between December of 2013(less than two months after his charge was filed) and the beginning of his administrative leave IDOT through a variety of acts and omissions acted out against Camacho[3]

In other words, the sign shop assignment was merely a continuation of things done to Camacho.

There is additional evidence which could allow a reasonable jury to infer that the sign shop assignment was retaliatory.

First, the sign shop position was clearly a demotion. It was clerical, not professional and was in a lower salary scale than the geologist position.  Being in that position would hinder Camacho's ability to secure positions in his professional field [¶108, 111 of Camacho's Statement].

Second, IDOT has never explained the process leading to the selection of that position. The database which IDOT claims it used in finding a position for Camacho identified five

---

[3] In previous section A(3) Camacho discusses that conduct on the part of IDOT.

positions which Camacho was eligible to hold and were open. He was offered none of them. To the contrary, IDOT informed Draper that the sign shop position was the only position that would be offered.  The sign shop position was not on the data base and was not posted to be filled [¶100, 101, 102, 103 of Camacho's Statement].

Third, a position was available which appeared well-suited for Camacho. It was a Geologist III position in IDOT's District 6 that was in Camacho's bargaining unit. The individual who had held that position was suspended and never returned to work. In the late summer of 2015 the position was vacant [¶91, 92. 93, 94 of Camacho's Statement].

On August 20, 2015 Prater informed Draper of the availability of the position it was explained to Draper that the only contingency was to secure the approval of the Special Master which Prater did not believe would be an obstacle. Prater never explained to Draper why that position was off the table [¶93, 95, 96 of Camacho's Statement].

IDOT now explains that position was not a good fit for the position because it had some supervisory responsibilities. A reasonable jury could discredit that explanation for two reasons.

First, IDOT, other than reviewing the job description, did nothing to look into what the supervisory responsibilities were [¶95 of Camacho's Statement].

Second, the first time IDOT claimed Camacho was ill-suited for the position because of its supervisory responsibilities was as a defense in this lawsuit. It never informed Draper that Camacho was not qualified to hold it. Rather on August 20, 2015 Prater, presumably after he had received the job description for the position, informed Draper it would be offered to Camacho subject only to the approval of the Special Master [¶93, 94 of Camacho's Statement].

### C) Camacho's Failure to Accommodate Claim

Camacho claims that IDOT failed to reasonably accommodate his disability in assigning him to a position in the sign shop when a vacant geologist position was available in District 6 that he was capable of filling.

To prevail in this claim Camacho must show that: 1) he is disabled; 2) is qualified to perform the essential function of a job either with or without a reasonable accommodation; and 3) IDOT took an adverse job action against him because of his disability without making a reasonable accommodation [*Winsley v. Cook County*, 563 F3d 598, 603 (7th Cir. 2009); and *Basden v. Professional Transportation, Inc.*, 714 F3d 1034, 1037 (7th Cir. 2013)].[4]

The ADA provides that a qualified individual with a disability is one who either with or without reasonable accommodation can perform the essential functions of an employment position [42 U.S.C. Section 12111(8)]. A qualified individual has the requisite skill, experience and education to perform the essential functions of the position [29 C.F.R. Section 1630.2(m)].

In a reasonable accommodation context whether a disabled individual is "qualified" is dependent upon the circumstances that exist at the time the request is made. An employer need not transfer an employee to a position for which he is not qualified [*Brown v. Milwaukee Board of School Directors,* 855 F3d 818, 820 (7th Cir. 2017)].

In August and September, 2015 Camacho had been away from work for over 12 months. Both his care provider and IDOT's evaluator concurred that his condition had significantly improved to the point that he was capable of returning to work although not to the Unit. For most of the 12 years he had worked at IDOT he had performed his duties as a geologist in a fully

---

[4]IDOT does not dispute the fact that Camacho was disabled. He was diagnosed with bipolar affective disorder, a serious mental illness. Earlier, Camacho discusses how the sign shop assignment constitutes an adverse employment action.

satisfactory manner. The problems with his work and attendance only surfaced after his illness

was diagnosed.  They seemed to be attributed to the symptoms of his illness as they existed prior

to his administrative leave [¶¶15, 16, 17, 24 of Camacho's Statement].

A reasonable trier of fact could conclude that when he returned to work Camacho would

be qualified for the Geologist III position in District 6.

Discrimination under the ADA includes an employer's failure to make a reasonable

accommodation to the mental limitations of an otherwise qualified individual with a disability

unless it can demonstrate that the accommodation would impose an undue hardship upon the

employer [42 U.S.C. 12112(b)(s); and *Beck v. University of Wisconsin Board of Regents,* 75 F.3d

1130, 1134 (7th Cir. 1996)].  An employer must make a reasonable effort to determine an

appropriate, reasonable accommodation. This is best determined through a flexible, interactive

process involving both the employer and the employee [*Beck* at p.1135].

Reassignment to a vacant position is an acceptable form of a reasonable accommodation

when the individual's current position would pose an undue hardship [42 U.S.C. 12111(9)(B)].

It "may not, however, be used to limit, segregate or otherwise discriminate against employees

with disabilities by forcing reassignments to undesirable positions- - -.  Employers should

reassign the individual to an equivalent position, in terms of pay, status, etc., if the individual is

qualified, and the position is vacant - - -" [29 C.F.R. 1630.2(o) and *Gile v. United Airlines,*

*Incorporated,* 95 F3d 492, 497-498 (7th Cir. 1996)].

An employer may reassign an employee to a lower grade position, but only if there are no

vacant equivalent positions for which the individual is qualified [29 C.F.R. 1630.2(o)].

An employer's duty to accommodate requires it to identify the "full range" of alternative

positions for which the employee satisfies the employer's legitimate nondiscriminatory qualifications. The critical factor is to match the employees knowledge, skills and abilities with the legitimate requirements of those positions [*Dalton v. Subaru-Isuzu Automotive, Inc.,* 141 F.3d 667, 678 (7th Cir. 1998)].

Once an employee requests a reasonable accommodation and employer must meet the employee halfway and engage in a "flexible interactive process" to identify the necessary accommodations [*Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir. 1996); *Basden v. Professional Transport, Inc.,* 714 F.3d 1034, 1038 (7th Cir. 2013; and *Reeves v. Jewel Flood Stores, Inc.,* 759 F3d 698, 701 (7th Cir. 2014)].

On September 29, 2015 IDOT directed Camacho to report to the sign shop in a new position. According to it, that was in response to the reasonable accommodation request he made over 17 months earlier. Putting aside that its response to Camacho's request was over 16 months late contrary to IDOT policy and its contention that it could not grant Camacho a temporary transfer is belied by the collective bargaining agreement governing his employment, there is other evidence to suggest that giving Camacho the sign shop position rather than the District 6 Geologist was not the product of a good faith effort to accommodate his disability.

First, IDOT made no attempt to engage in a"flexible interactive process" to identify a position for Camacho. Disturbingly, it now claims that Camacho was ill qualified for the geologist position, but failed to explore with Draper whether Camacho was truly ill qualified for the position [¶95 of Camacho's Statement].

Second, IDOT cannot limit, segregate or discriminate against Camacho by forcing a reassignment to an undesirable position [29 C.F.R. 1630.2(o)]. To a professional geologist the

sign shop position was far from desirable. Moreover, that position according to the IDOT database was not one IDOT was in the process of filling [¶93, 96 of Camacho's Statement].

Third, IDOT could only assign Camacho to a lower grade position (the sign shop) if there were no available vacant, equivalent positions for which he was qualified. The Geologist III position in District 6 was available.  Until the onset of his illness Camacho had competently served IDOT for many years as a geologist advancing to a Geologist III classification.  IDOT made no effort to match Camacho skill set with the legitimate requirement for the position.

Finally, while it claims Camacho was ill qualified for the position because of its supervisory responsibilities it failed to investigate what those responsibilities were. It did not look into what was being done to handle the supervisory aspects of the job while the position was vacant. It failed to speak with anyone in District 6 about the position. What it knew about the supervisory's responsibilities is nothing more than what was stated on the position description [¶95 of Camacho's Statement].  Its determination that Camacho was ill qualified for the position was superficial at best.  A reasonable jury could wonder if the now claimed requirements for the position were legitimate [¶95 of Camacho's Statement].


## IV.  CONCLUSION

A summary judgment proceeding is not a substitute for trial.  It should only be granted when it is clear that there is no material dispute of fact and the law requires judgment for the Defendant based upon those undisputed facts.

The briefs submitted by the parties in this case, if nothing else, show the existence of a significant dispute concerning facts which are material to the outcome of this case.

Because he has fulfilled his burden of presenting those facts, Luis Camacho respectfully requests that  IDOT's motion for summary judgment be denied.

Luis Camacho, Plaintiff

By:_____/s James P. Baker_____
        James P. Baker
        Bar Number: 0097802
        Baker, Baker & Krajewski, LLC
        415 South Seventh Street
        Springfield,  Illinois   62701
        Telephone:  (217) 522-3445
        Facsimile:  (217) 522-8234
        E-mail:  jpb@bbklegal.com
        (Memorandum/camachol msj opposition 052019)

**<u>CERTIFICATE OF SERVICE</u>**

       I hereby certify that on May 21, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Dylan Grady
Attorney General's Office
500 South Second Street
Springfield,  Illinois   62701
Phone:  (217) 782-9026
Email:  <u>dgrady@atg.state.il.us</u>

                    By: <u>s/James P. Baker             </u>
                        Baker, Baker & Krajewski, LLC