E-FILED
Tuesday, 13 October, 2020  11:24:40 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LUIS CAMACHO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-3317 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF TRANSPORTATION, | ) ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, United States District Judge:

Luis Camacho ("the Plaintiff" or "Camacho") has filed a three-count amended complaint wherein he asserts Defendant Illinois Department of Transportation ("IDOT") violated his rights by retaliating against him by treating him less favorably than other employees, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12203 ("ADA") and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3) (Count I).

Plaintiff also alleges that IDOT did not reasonably accommodate him with respect to his work assignment in violation of the ADA (Count II).

Finally, Plaintiff asserts that his work assignment was retaliatory because of his earlier charge of discrimination in violation of both the ADA and Title VII ("Count III").

Defendant IDOT moves for summary judgment.

## I.      INTRODUCTION

IDOT moves for summary judgment on Camacho's retaliation claims, alleging he is unable to establish a prima facie case for retaliation.  Moreover, the Plaintiff has not identified an adverse employment action.  He also was not meeting the legitimate expectation of his employer as it relates to time and attendance.  IDOT claims it did not retaliate against the Plaintiff when it assigned him to another position as part of a reasonable accommodation request.  IDOT also contends it did not discriminate against Camacho on account of his disability.

The Plaintiff claims the record contains substantial evidence which undermines IDOT's contentions and summary judgment should thus be denied.

## II.      FACTUAL BACKGROUND

### (A)

Plaintiff Luis Camacho began employment with IDOT in 2002 as a Geologist I in the Bureau of Bridges and Structures in the Foundations and Geotechnical Unit. He became a Geologist II in 2005 and a Geologist III in 2007.  While employed as a Geologist, Camacho received acceptable performance evaluations until 2012.  By

2014, Camacho had achieved the title of Geologist III but was not in a supervisory role.   Camacho has a bachelor's degree in geology and a master's degree in geological engineering.  His work experience was in that field.  However, Camacho is not a licensed engineer.  In 2013, Camacho's co-workers in the Foundations and Geotechnical Unit consisted of Edgar Galofre and Bradley Hessing, the acting supervisor.  Hessing had been promoted to group leader in 2012.

William Kramer was employed by IDOT as the Unit Chief of the Foundations and Geotechnical Unit in the Bureau of Bridges and Structures.  Mr. Kramer was Bradley Hessing's direct supervisor.

Since July of 2015, Carlos Ramirez was the Chief of IDOT's Civil Rights Bureau and the ADA Coordinator.  Karen Ward preceded Ramirez at the Civil Rights Bureau, while David Dailey preceded him as the ADA coordinator.  Michael Prater worked for IDOT in the Office of Chief Counsel.

In 2014, Dianna Taylor was Payroll and Benefits Manager at IDOT.   In January of 2015, Taylor was appointed Bureau Chief of Personnel Management.

David Greifzu was employed by IDOT as the Bridge Planning Section Chief. As Chief, he supervised the Foundations and Geotechnical Unit ("the Unit"). Camacho alleges Greifzu directed Kramer to stop allowing Camacho to take time off from work.  The Defendants claim when Greifzu became Section Chief in 2012, he more strictly enforced IDOT's policy regarding time and attendance as to all

employees—not just Camacho.  Mr. Kramer, the prior Section Chief, did not enforce IDOT's time and attendance policy.  Kramer had allowed employees to make up time at the end of the shift.  Camacho claims that Kramer never contemplated disciplining him before Greifzu became his supervisor.  Camacho worked in the Unit with Kramer for 12 years.  The Defendants state that the relevant time period is after the Plaintiff filed his Complaint in October 2013.  Any time period before that is immaterial.

The Unit was responsible for assisting other units in endeavors relating to bridge construction.  The work of a geotechnical engineer and a Geologist III in the Unit is much the same.  The bulk of the work involved reviewing plans, reports, and designs.  The type of work Camacho performed in the Unit was both consistent with his professional background and professionally fulfilling.  There was no difference in the type of work Camacho was assigned in 2004 and what he was assigned in 2011 and 2012.

After Hessing was promoted to group leader, the number of employees doing the production work was reduced to two.  However, the work load in the unit increased.  There was also a female contract worker in the Unit who performed the same type of work as Camacho and Galofre.  As group leader, Hessing supervised Camacho and Galofre and assigned and reviewed their work.

(B)

4

The Plaintiff alleges his supervisors treated him differently and less favorably than other employees in his bureau by monitoring his time, preparing unfavorable performance evaluations and ignoring his requests.  IDOT alleges every employee in Camacho's unit was required to follow the same sign-in and sign-out procedures and that Camacho was the only employee in the unit that had issues adjusting to the new procedures.  Camacho disputes this allegation.

In the performance evaluations Camacho received prior to June 30, 2013 for fiscal years 2005, 2006, 2007, 2009 and 2011, his performance was rated as fully satisfactory.  Moreover, it was not noted in any of those reviews that Camacho lacked the technical skills necessary to perform the work required of him in the Unit.

Kramer prepared the July 1, 2012 to June 30, 2013 performance evaluation of Camacho.  The evaluation was signed by Hessing and Kramer on August 1, 2013, but was not signed by Camacho until January 21, 2014.  Camacho had to file a grievance through his union to obtain his evaluation.  The evaluation had been held at the direction of Kramer's supervisor and Johnson for over five years.

Beginning in 2012, Camacho's mental health issues began impacting his work performance and attendance.  IDOT claims it became most severe in 2013, while the Plaintiff alleges it was most severe in 2014.  In 2012-2013, Camacho was frequently taking time off during the workday, with this occurring an average of two to three times per week.

5

The Plaintiff was first diagnosed with depression in 2002, though his depression did not affect his work at that time. In 2013, Camacho was diagnosed with bipolar disorder. Camacho states that he experiences symptoms such as anxiety which lead to panic attacks. His symptoms began in 2012 and continued thereafter. Camacho is not aware of anyone else in his unit, or in the units supervised by David Greifzu, that had the same mental health conditions as he did.

Camacho made an accommodation request in 2012 asking to move cubicles because the noise from co-employees was disturbing him. That request was allowed. In August of 2012, Camacho requested accommodation for a work schedule modification and flexible leave policy. He stated that he was not sleeping well because of anxiety and panic attacks which prohibited him from getting out of bed. He also said he was struggling to get to work on time. Camacho's request was denied. Camacho requested a flex schedule because if he arrived five minutes late, he would be reminded that tardiness was subject to discipline.

Bradley Hessing made the call on what projects to assign to Camacho after August 1, 2013. William Kramer believes that in 2013 and 2014 there was enough work in the unit to keep everyone busy.

Beginning in late 2012, Camacho had to go to his counselor two to three times a week, sometimes in the middle of the day, due to panic attacks. When Camacho

was having anxiety issues, he used FMLA time and benefit time to cover his absences.  Once his benefit time was exhausted he was not paid during his absences.

The Plaintiff alleges his attendance problems were due to his depression.  The Defendant objects to that assertion on the basis that Camacho lacks the medical training to offer such an opinion.

Camacho claims that others in the Bureau supervised by Greifzu, including Tim Craven in the planning unit, were allowed to work extra at the end of the day.  Moreover, Camacho alleges his tardiness was no worse than anyone else on the unit prior to 2012.  The Defendant claims those assertions are based only on the Plaintiff's speculation.

In 2012 and 2013, Kramer kept track of time.  Camacho claims he was singled out by monitoring his time when others without a disability did not have their time monitored.  The Defendant objects to this allegation, claiming Plaintiff lacks personal knowledge.

In his last evaluation, Camacho's production was characterized as lower than in the previous year because he was absent from work more frequently.  According to Hessing, however, Camacho was still generally able to complete his work within the required time frame.

(C)

On August 13, 2013, the Plaintiff submitted an accommodation request to IDOT wherein he sought an accommodation to modify his work schedule and allow him a flexible leave policy due to his bipolar affective disorder type 2 with a "mainly depressed mood." Camacho claimed that anxiety and depression made it hard for him to get out of bed and he usually stayed in bed "frozen" with anxiety not being able to get up. He noted that he had been labeled, because of his condition, a malingerer and challenger of the system by coming to work late.

IDOT claims that, as a result of this accommodation request, it negotiated a flexible leave policy and work schedule for Camacho. Camacho disputes this allegation. IDOT alleges that beginning in December 2013, Camacho was allowed to arrive late on occasion, an allegation which he disputes. The Plaintiff discussed his mental health diagnosis only with the personnel department.

The Plaintiff alleges that, on August 23, 2013, Kramer informed Johnson that Camacho had a "flare up" the previous day and had to leave his work station for 45 minutes. Kramer recommended to Brian Johnson in Personnel that Camacho should be able to take the time without pay given that he had a "serious genuine condition" and is attempting to secure an FMLA approval. Johnson replied that the absence should not be signed off as authorized and the situation "would be a valid case of an unauthorized absence." He was informed not to approve Camacho's leave slip. The Defendant objects to the assertion, claiming that Kramer was not speaking

8

"concerning a matter within the scope of the agency or employment." There is no evidence Kramer's responsibilities included employment hiring or firing decisions or discipline decisions.

The Plaintiff does not believe Hessing or Kramer treated him unfavorably because of his race or disability. In 2013, Camacho was approved for FMLA leave to cover intermittent absences, appointments and flare-ups. As a result of Camacho's August 2013 accommodation request and approved FMLA leaves, Camacho was provided a number of different accommodations regarding his time.

On October 24, 2013, Camacho filed a Complaint with the Illinois Department of Human Rights and an EEOC charge of discrimination alleging that he was being discriminated against because of his disability and his race. His IDPH charge claimed he had been prohibited from taking time off for medical and personal reasons, been subjected to harassment and subjected to unnecessary disciplinary action because of either his Hispanic ancestry or his disability.

If an employee complains about treatment from a supervisor in a discrimination charge to the Department, his supervisor is interviewed by IDOT. Carlos Ramirez testified regarding a number of potential ways IDOT would investigate complaints filed with IDHR. Kramer was aware Camacho made a discrimination claim. He answered questions via telephone for the Department while Camacho was still working in the Unit.

The Plaintiff alleges that after he filed his civil rights complaint in 2013, be began to be assigned less work.  Camacho communicated the idleness to Hessing by sending reports on his work assignments.  When Camacho reported he had little work, Hessing told Camacho not to bother him.  Camacho stopped telling Hessing he did not have enough work when he got no results.  During this time, Hessing continued to assign work to both Galofre and the contractual worker.  The Defendant claims these allegations are based solely on Plaintiff's speculation.

The Plaintiff claims that, initially, Kramer did not consider Camacho tardy if he came in a minute or two late and covered the time at the end of the day.  Greifzu and Johnson later told Kramer being tardy was a problem, directed him to no longer accept tardiness and to document Camacho's tardiness.  The Defendant objects to the extent that Greifzu told Kramer to more strictly enforce IDOT's time and attendance policy as to all employees, not just Camacho.  Moreover, Camacho was the only employee in the unit that had issues adjusting to the new procedures.

Late in 2013, Attorney Carl Draper began representing Camacho.  On December 18, 2013, Draper on Camacho's behalf requested some accommodations because of Camacho's disability.  The most important of these was that he be allowed a 30-minute window at the beginning of each day for flex time in the event he is having a medical problem making it difficult for him to get to work by the normal starting time.

The Plaintiff claims that, at that time, his supervisors were concerned about his frequent tardiness. Mr. Draper understood Camacho's tardiness was attributable to his medical condition and believed that the requested accommodation would address the tardiness problem. The Defendant disputes the Plaintiff's assertion on the basis that an attorney who lacks medical training cannot render conclusions or opinions about an individual's symptoms.

In late December of 2013, Camacho began calling in to notify Hessing or Kramer if he would be late. According to Hessing, Camacho was normally good about calling in when he would be late.

### (D)

On March 20, 2014, Camacho submitted an accommodation request to IDOT seeking a "temporary transfer to a new position that involves complete [sic] different assignments, responsibilities." He indicated he suffered from bi-polar II disorder, severe depression, anxiety and panic attacks. He requested a temporary transfer to a new position that involved different assignments, responsibilities and supervision which would allow him time to develop strategies and techniques for managing the symptoms of the condition. Camacho's request remained open until he was offered a new position in 2015.

The Plaintiff claims that a move to a different area would allow the treatment at work to cease while he was being treated for his illness. Camacho wanted to be

moved for six months. At the time, Camacho was suffering from symptoms of anxiety and panic attacks. The idea of a temporary transfer was to enable him to work temporarily in an environment where he did not have the stressors he was experiencing in his present assignment while he was being treated for those symptoms. The Defendant objects to these allegations to the extent that Camacho is offering an opinion regarding how treatment would have affected him, on the basis that that he lacks the medical knowledge and skill.

Camacho's request for a temporary transfer was approved by JP Fyans, the lawyer for his union.

When Camacho requested the temporary assignment his marital and financial problems were behind him. However, his symptoms were getting worse. He had anxiety and panic attacks every morning. He wondered what would happen at work each day. His work assignments had decreased by 40%. Accordingly, he was often idle at work. He became anxious and worried because he had no work.

The Plaintiff alleges that under his former supervisor, he had no times of idleness. By March of 2014, Camacho might have a week of idleness. Sometimes Camacho was waiting for Hessing to finish his review of his work before being given a new assignment. It was stressful. When Camacho was busy at work, it helped him deal with his symptoms. He could focus on work and not think about other things. He became upset when he was idle. The Defendant claims these facts are immaterial

12

because he has not established any evidence that his workload decreased because he was being retaliated against because of IDHR complaints or his disability.

Camacho's request for a reasonable accommodation was presented to Kramer who passed it along to his supervisor.  Kramer recommended that the request for a reassignment to a vacant position be allowed.  He thought it reasonable and noted that Camacho "is ill and keeping him in this stressful environment is not helping him or us."  Carl Puzey, the head of the Bureau, recommended its approval as well.  These recommendations were made on March 21, 2014.  The Defendant disputes the allegation, to the extent that no evidence establishes that Kramer or Puzey's responsibilities included making decisions regarding reasonable accommodations.

Under IDOT policy, it is supposed to respond to an accommodation request within 30 days.  If IDOT cannot accommodate the request, IDOT will talk with the employee and might request additional information from a physician.  It is an interactive process for reasonable accommodation.  The employee is provided a written response on whether the request is allowed or denied.

The Plaintiff alleges Kramer understood that he suffered from bipolar disorder.  Camacho was open about being ill and needing an accommodation.  While Kramer did not know what bipolar disorder is, he understood it to be a mental illness. Camacho told Kramer that he suffered from panic attacks, severe depression and

13

anxiety. Kramer felt that Camacho was almost angered by the lack of accommodation. Kramer was also aware that Camacho was being treated on a weekly basis for his condition because he signed his leave slips. Between March 20 and July 30, 2014, Kramer believed that Camacho was feeling that he had been persecuted and treated unfairly. The Defendant objects to these statements on the basis that Kramer lacks personal knowledge of the facts alleged. Moreover, he lacks the foundation to have any opinion regarding how Camacho's medical conditions were affecting his work or whether the medications were working correctly.

Camacho remained in the Unit until he was placed on administrative leave. Kramer does not know what happened with Camacho's request. The Plaintiff alleges Prater does not know whether the collective bargaining agreement covering Camacho prohibited a temporary transfer or reassignment. The Defendant claims Prater was informed by Personnel that they could not provide a temporary transfer.

Once he submitted his request for accommodation, Camacho received no response from IDOT between March 20, 2014 and July 31, 2014--the date he was placed on administrative leave. Camacho does not know what happened to his request. He had no follow-up conversations with anyone at IDOT about his request. IDOT acknowledged that Camacho's request was not resolved prior to his administrative leave.

Between March 20, 2014, when Camacho made his temporary transfer request and July 30, 2014, neither Prater, Dailey nor any other IDOT employee ever contacted Attorney Draper concerning Camacho's accommodation request. Camacho remained in the position he had been in throughout the course of his employment for IDOT.  Mr. Draper was never informed by an IDOT official that IDOT could not grant Camacho a temporary transfer until September of 2015 when he was assigned to work in the IDOT sign shop.  Draper stated that Camacho's union was receptive to the idea of IDOT granting him a temporary transfer as he had requested.

On the morning of April 3, 2014, Kramer sent an email to Camacho telling him that his accommodation request had not yet been allowed.  In a responsive email to Kramer and David Daley, Camacho requested that Daley "please" let him know when his request for an accommodation would be granted.  On April 9, 2014, over 100 days after Draper made the request, the accommodation was granted.  The Defendant disputes that it did not work to accommodate Plaintiff's disabilities regarding a flexible work schedule when Plaintiff submitted an accommodation request in August 2013.  For purposes of the ADA and Rehabilitation Act, moreover, regular attendance is an essential function of many jobs.

(E)

In January of 2014, Hessing knew that Camacho was seeking treatment for personal problems and was aware he was on medication. Camacho was involved in an incident with Hessing on January 31, 2014. He had arrived at work late that day after a bad night. Hessing's phone was busy when Camacho tried to call. Camacho left a message with Galofre that he would be late and Galofre passed it on to Hessing. Hessing thought Camacho did not attempt to notify him and became upset. He directed Camacho to go to the hallway, which he did. While Camacho was leaning against the wall, Hessing put his hand near Camacho's ear, almost touching him. Hessing berated Camacho for not calling him while pointing his finger in Camacho's face. They were about two feet apart. Hessing, who is much larger than Camacho, acknowledged he was angry. Camacho felt threatened by Hessing and believed he was in his personal space. He had never seen Hessing get upset with any of his coworkers. On February 3, 2014, Camacho by email informed Kramer about his concerns regarding Hessing's conduct. The Defendant contends the allegations relating to this incident are not relevant to Camacho's retaliation claims. Moreover, the altercation cannot form the basis of an adverse employment action.

In 2014, Camacho displayed symptoms to Hessing which caused him to believe Camacho had a mental illness. Hessing thought Camacho's symptoms were getting worse. It appeared to Hessing that Camacho was having a rough time. The Defendant objects to these allegations to the extent that Camacho is attempting to

offer an opinion regarding symptoms of his medical condition given that he is not qualified to do so.

On June 10, 2014, Kramer reprimanded Camacho for eating at his work cubicle. On June 20, 2014, Camacho was two minutes late to work according to Kramer's computer. Camacho believed he was 30 seconds late and wrote 8:00 on the time sheet. Kramer noted on the time sheet 8:02. On that day, Kramer informed Hessing that Camacho signed in that morning indicating he was there at 8 a.m., when according to Kramer's computer the actual time was 8:02 a.m. Kramer made a point of putting the designation "8:02 wmk" next to Camacho's entry. He noted that Camacho got upset when he saw it.

The Plaintiff alleges that, according to Kramer, by the time of that incident there was now an intense scrutiny of Camacho's time. According to Kramer, the average employer was not under that scrutiny and it bothered Camacho. Kramer would not have corrected the time sign in for other employees. He was directed by his supervisor to document the exact time for Camacho only. This scrutiny of Camacho increased over time until Camacho took administrative leave. The Defendant objects to these allegations to the extent he is suggesting the change in policy applied only to him. Greifzu instructed Kramer to more strictly enforce IDOT's time and attendance policy as to all employees, not just Camacho. Every employee was required to follow the same sign-in and sign-out procedures.

The Plaintiff alleges that between July of 2013 and February of 2014, Kramer was tardy 13 times, Hessing was tardy 24 times and Garfole was tardy 8 times. The Defendant notes that, over the same time period, Camacho was tardy 78 times and 20 additional times Plaintiff was tardy but approved for a flex schedule. Moreover, there were an additional 10 times that Plaintiff did not report to work and did not call to say he would not be in. Camacho was allowed to work late 21 days during that time period and was short of 7.50 hours 11 times. During that time period, Camacho took leave on 54 occasions.

Kramer received no warnings or discipline for tardiness. Kramer spoke with Hessing about being late and that as a supervisor it was a problem. According to Kramer, there were a number of days in which Hessing was very late. Unlike Camacho, Hessing lived close to work and had no medical issues.

In 2014, Camacho was on proof status. Johnson required that any leave slip of Camacho had to be accompanied with a medical slip. That requirement did not apply to others in the Unit. The Defendant objects on the basis that, pursuant to an accommodation, Camacho was removed from proof status.

At one point, Kramer accused Camacho of falsifying the time he reported to work and stated it would be reported to investigators. Camacho was also accused of falsifying Kramer's signature on the sign in sheet.

On July 9, 2014, Camacho asked Hessing why he was not assigned some work that had recently been received in the Unit. In response, Hessing stated that Camacho had other responsibilities and "please don't waste time worrying about what has or has not been assigned to you."

The Plaintiff alleges that from January 2014 to July 2014, when Camacho was placed on administrative leave, he was receiving fewer work assignments. The Defendant disputes the assertion, claiming Camacho lacks the foundation for this fact and bases it solely on his own speculation.

(F)

On July 31, 2014, Camacho was placed on administrative leave with pay. He was instructed to remain available by telephone during normal business hours and was forbidden to enter upon IDOT property without prior approval. He was informed that his failure to comply with these conditions would subject him to disciplinary action.

On August 14, 2014, Camacho underwent a fitness for duty exam with Dr. Kristen Ferguson, M.D., at Midwest Occupational Health Associates. Dr. Ferguson noted that Camacho had exhibited some significant behavioral and disruptive qualities at work and that those issues had existed for some length of time. After examination, Dr. Ferguson determined he was not fit for duty.

Additionally, at the request of IDOT, Camacho met with Terry Killian, M.D. on September 12, 2014, September 22, 2014 and October 3, 2014, for the purpose of an independent fit for duty exam. IDOT provided Dr. Killian with several hundred pages of documents consisting largely of email communications between Camacho and his supervisors. Dr. Killian issued his report on October 31, 2014. Dr. Killian noted that Camacho had "missed an enormous amount of work time" over the last few years. Dr. Killian observed that in 2013, Camacho had approximately 75 instances of time off without pay. Dr. Killian also noted that IDOT submitted documents regarding instances accommodations were made for Camacho concerning his time and attendance, including but not limited to, 24 separate instances where Camacho was allowed to work late to make up for having been late to work so he did not have to take leave time. In his October 31, 2014 report, Dr. Killian found that Camacho was "currently suffering from severe depressive and anxiety symptoms which are clearly severe enough to interfere with his capacity to adequately perform the duties of his position." He concluded the depression was probably associated with bi-polar disorder. He also opined that Camacho had a possible anxiety disorder. Dr. Killian opined that Camacho was not capable of working at the time of the evaluation. Dr. Killian further recommended that, "when Mr. Camacho is able to return to work, he start in a different bureau at IDOT." He reasoned that both Camacho and his supervisors contributed to making his work

environment worse and the bad feeling between them was such that it would not be possible to rebuild a mutually respectful working relationship.

Camacho remained on administrative leave with pay until around November 14, 2014, when he was removed from his paid administrative leave and placed on a non-occupational disability leave. Thereafter, Camacho applied for and received SERS disability benefits at half-pay from November 14, 2014, until Camacho resumed working at IDOT on October 1, 2015. Prior to returning to work from the non-occupational disability leave, IDOT required Camacho to attend a fit-for-duty exam with Dr. Killian.

In conducting his evaluation, Dr. Killian requested that IDOT provide him with Camacho's performance reviews. He noted that the August 1, 2013 performance evaluation was the first "significantly negative evaluation." The evaluation referred to "continuing problems" with the quality of Camacho's work, though his prior performance evaluations had not been critical of his work quality. It was the view of Dr. Killian that Camacho's supervisors were excessively picky (examples include making a big issue out of him being a minute or two late to work, criticizing him for being at his desk too early and eating at his desk). Dr. Killian stated, "All of this seems to me to be like a pretty silly way to treat a man with a masters degree in engineering who has demonstrated more than adequate competence (as per his performance evaluations the first few years"). The

Defendant claims these allegations are immaterial, given that relevant performance evaluations would be those given near or at the time of any potential adverse employment action.

In 2014 and 2015, Camacho was treated by Keith Buescher, Ph.D., a clinical psychologist. On May 20, 2015, Dr. Buescher released Camacho to return to work "only if transferred to another position away and separate from current position." Dr. Buescher stated that Camacho could not work under the same job stress, supervision or work climate.

In a follow-up fitness for duty examination in July 2015, Dr. Killian noted that it appeared Camacho had "improved sufficiently to be able to return to work;" however, Dr. Killian "strongly recommended" that Camacho should not be returned to his previous workplace and should be transferred to a different bureau. He believed that if Camacho were to return to his previous workplace, the relationship between Camacho and his supervisors would make it unlikely that they could rebuild a productive working relationship and it was "much more likely that Mr. Camacho and the supervisors would end up spending a great deal of their time documenting each other's behavior rather than focusing on the important work that the State of Illinois needs IDOT to do." Dr. Killian concluded that Camacho suffered from bi-polar mood disorder, type II and possible anxiety disorder.

Despite being found fit for duty in July of 2015, the Plaintiff was returned to work on October 1, 2015. Camacho was not returned to administrative leave status between July and October 2015 while waiting for a position to be found for him.

(G)

Prater was involved in locating a position for Camacho. In the summer of 2015, Draper had conversations with Prater about the position Camacho would return to with IDOT. Because he has a master's degree in geology and over 12 years of geotechnical work experience with IDOT, Camacho and Draper hoped that a position could be located that would allow him to utilize his education and experience. Prater sent job descriptions to Draper for a sign shop in District 6, a Geologist III position in District 6 and a job in the Bureau of Materials and Physical Research.

While representing Camacho, Mr. Draper was his spokesman in dealing with IDOT officials concerning Camacho's employment issues that included his requests for reasonable accommodation and his effort to return to work for IDOT in the summer of 2015. Regarding each of those issues, Draper was always willing to meet and confer with IDOT. Neither Camacho nor Draper ever refused to interact with IDOT officials concerning these matters. Draper focused on Camacho's disability claims that were not being accommodated. Camacho and Draper sought a meeting with Daly for assistance. He helped obtain one meeting with IDOT officers. The

Plaintiff states it was difficult to obtain cooperation from IDOT officials.   The Defendant claims that, to the extent Plaintiff is alleging these facts rebut Defendant's argument that Plaintiff failed to engage in the interactive process, the facts are immaterial because they do not relate to the correct time period.

In 2016, Camacho filed an IDHR complaint which gave rise to this lawsuit.

IDOT was actively looking for positions for Camacho to try to get him back to work from leave.  Camacho claims this is true only to the extent that beginning in the summer of 2015, IDOT informed Camacho's lawyer of some possible positions for Camacho.   At IDOT positions are divided between those covered by the personnel code with Central Management Services (CMS) having final authority, and technical or non-code positions which IDOT has authority over.

IDOT claims it considered a number of jobs for Camacho.   In finding a position for which Camacho was qualified, IDOT looked at his job description, his degrees and certifications, his bargaining unit, pay scale and personnel code.  The Plaintiff disputes these allegations.

IDOT considered a Geologist position in the Bureau of Materials and Physical Research; however, because there was a Geologist I that had been recently hired, there would not have been enough work for Camacho.  IDOT also alleges Camacho did not want a position in the Bureau of Material and Physical Research, an assertion which Camacho disputes.

IDOT alleges that Camacho, through his attorney, asked about a Geologist III position in District 6 that was available.  However, that Geologist position was not vacant at the time, though it was held by an employee who was suspended and never returned to work.  Prater does not know who was performing the duties of the position while the employee was gone.  IDOT claims it did not believe it would be a good fit for Camacho because it was a supervisory position and Camacho had not been in a supervisory role previously.  Camacho contends that at no time did Prater or any other IDOT official ever inform Draper that either the District 6 position was unavailable or that Camacho was not suited for the position.  Prater claims what he knew about the supervisory duties is only what was listed in the job description.

The Plaintiff alleges Draper informed him and his union representative that Prater had confirmed to Draper that Camacho would be reinstated in a geologist position in a different building.  He told them Prater said that he "has other work to do with Personnel on this but sees no problems."  IDOT disputes these allegations, claiming Camacho has misstated the evidence.

IDOT also considered a display shop position for Camacho.  However, the display shop position was a position covered by the personnel code, and CMS informed IDOT that it could not place Camacho in that position.  Additionally, Camacho did not have any active personnel grade, which would have been required for the position.

(H)

IDOT claims that, ultimately, it offered and Camacho accepted a position located in the sign shop. The Plaintiff alleges he was assigned this position by IDOT and was told it was the only position that he could fill. The sign shop position was in the pro-technical union and allowed IDOT to pay Camacho the same as what he was making in the Geologist III position.

IDOT alleges Camacho started in the sign shop position on October 1, 2015, and IDOT was unaware of any request for a different position until the litigation in this matter. The Plaintiff disputes this allegation. Camacho further asserts the District 6 Geologist position remained open at that time, which IDOT disputes.

On August 21, 2015, Prater forwarded Draper a position description for a quality assurance geologist position in the Bureau of Materials and Physical Research. Draper never informed Prater or anyone else at IDOT that Camacho would not accept that position.

On August 28, 2015, Prater sent Draper a position classification for an engineering technician III position in IDOT's Central Sign Shop. That was the first communication Draper ever received from IDOT concerning the sign shop position. In 2015, Camacho was classified as a Geologist III. It was a position in the Teamster's Bargaining Unit. Taylor was asked to look for vacant positions with a similar pay grade to Camacho's current pay grade and pass that information along

to Prater. The database identified open positions. It did not list any open positions in the Bureau of Operation which included the sign shop. The sign shop position was not posted to be filled at the time Camacho was assigned to it and no other people applied for the position.

IDOT claims that a temporary transfer would have been a concern from a personnel standpoint because there was no provision for a temporary transfer in the union agreement or personnel code. At that time, moreover, all personnel moves had to be approved by the court-appointed Special Master. The Plaintiff disputes these allegations.

The Plaintiff alleges that between August 31, 2015 and October 31, 2015, there were five open positions posted that Camacho met the qualifications for and was eligible to hold. IDOT claims this misstates the evidence.

Prater participated in a telephone conversation on September 16, 2015, with Ramirez and Draper to make the sign shop offer. It was explained to Draper that the sign shop position was the last option that was available to Camacho. Draper was informed at that time that IDOT was assigning Camacho to its sign shop. Prater explained to Draper that the sign shop position was the only one that would be offered to Camacho. No explanation was given to Draper about why the District 6 geologist position was not being given to Camacho. IDOT claims it remains undisputed that Camacho was found unable to continue to perform his duties as a

Geologist and the ADA does not entitle a disabled employee to his accommodation of choice.

In September 2015, Ramirez informed Draper that IDOT was denying Camacho's accommodation request. Although Camacho's March 2014 request for accommodation sought a temporary transfer, IDOT could not offer a temporary transfer in 2015 and the position in the sign shop as an ET III was a permanent position. The Plaintiff disputes that IDOT could not offer him a temporary transfer. An ET III is an engineering technician III. It is a lower classification than a geologist. The upper level of the pay scale for the ET III position is lower than that of a geologist III.

On September 29, 2015, IDOT sent a letter to Camacho directing him to report to IDOT's Central Sign Shop on October 1, 2015. Although it indicates on its face that the assignment is in response to his request for a reasonable accommodation, the accommodation he requested was made on March 20, 2014, over 18 months earlier. The sign shop position was never an accommodation requested by or on behalf of Camacho. IDOT claims these assertions are irrelevant because Camacho does not get to determine precisely what accommodation he receives. Camacho testified he accepted the position because he believes he would have been dismissed if he had not gone to the sign shop.

The construction signs used by IDOT are ordered through the sign shop. Camacho becomes involved as the signs are leaving the shop. He adds the number of signs and amount to a spreadsheet. He verifies the orders are complete and accurate. Camacho also creates and maintains a database and verifies orders from the districts.

As a Geologist III, Camacho was not at the highest point in his salary scale. When he went into the sign shop, Camacho's job classification was lower than a Geologist III. While his salary was not reduced, he was at the top of the scale in his new position. Camacho claims he would have received pay increases as a Geologist III. He would not see pay increases as an ET III. IDOT claims Camacho lacks foundation for this fact and his own speculation is insufficient to support it.

The work in the sign shop does not require training in geology or geotechnical engineering. The Plaintiff testified that the work is not professionally fulfilling and has affected his self-esteem. Camacho further claims the sign shop position hinders his ability to get a geotechnical position because he has been away from that work since 2014. IDOT notes that Plaintiff has not applied for any Geologist position. Camacho further asserts his self-esteem has gone down working in the sign shop. He states he has become depressed again and is taking medication for health issues. IDOT object to these assertions to the extent Camacho is attempting to offer an opinion as to the cause of his symptoms.

IDOT seeks summary judgment on all of Camacho's claims.

## II. DISCUSSION

IDOT alleges Camacho cannot meet a prima facie case of retaliation because Camacho has not identified any adverse employment action he suffered while employed in the Geologist position. Moreover, Camacho was not meeting the legitimate expectation of his employer as it relates to time and attendance. Additionally, IDOT did not retaliate against Camacho when it assigned him to the sign shop as part of a reasonable accommodation request. IDOT seeks summary judgment on Counts I and III for these reasons. IDOT claims it is entitled to summary judgment on Count II because it did not discriminate against Plaintiff on the basis of disability because Camacho was not a qualified individual as a Geologist, IDOT offered and Camacho accepted a reassignment to a sign shop position and Camacho failed to engage in the interactive process.

Camacho contends the record contains ample evidence undermining IDOT's contentions and summary judgment should be denied on that basis.

### Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Court views the evidence and construes all reasonable inferences in favor of the non-movant. *See*

*Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019).   To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture."   *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted).   "The court does not assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence."   *Driveline Systems*, 36 F.3d at 579 (internal quotation marks omitted).   Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor.   *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

Retaliation claims

"Title VII's anti-retaliation provision provides that it is unlawful for an employer to discriminate against its employee because the employee filed a complaint or participated in an investigation of an unlawful employment practice." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (citing 42 U.S.C. § 2000e-2(a)).   A plaintiff asserting a Title VII retaliation claim "must produce enough evidence for a reasonable jury to conclude that (1) [he] engaged in a statutorily protected activity; (2) the [employer] took a materially adverse action against [him]; and (3) there existed a but-for causal connection between the two." *Id*.   If the plaintiff establishes a prima facie case of retaliation, the employer may point to evidence which, if accepted as true, would permit the conclusion that it had

a legitimate, non-discriminatory reason for the adverse employment action.  *See id*. If the employer meets this burden, the plaintiff can avoid summary judgment by "produc[ing] evidence that would permit a trier of fact to establish, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination."  *Id*.

"[A] materially adverse action need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity."  *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018) (internal quotation marks omitted).   Because Title VII does not establish a general civility code, its "anti-retaliation provision does not protect an employee against petty slights or minor annoyances that often take place at work and that all employees experience."  *Id*. at 867-68 (internal quotation marks omitted).   The provision protects works from "retaliation that produces an injury or harm."  *Id*. at 868.

The Plaintiff alleges that an action which might not be materially adverse to a normal employee could reach that threshold for an employee with specific vulnerabilities.  In *Washington v. Illinois Dept. of Revenue*, 420 F.3d 658 (7th Cir. 2005), for example, the Seventh Circuit determined that while changing an employee's work hours from 7:00 a.m.-3:00 p.m. to 9:00 a.m.-5:00 p.m. would not

be a materially adverse employment action for the overwhelming majority of employees, it could be for an individual like the plaintiff who needed flex time in order to care for her child with a medical condition. *See id.* at 662-63.

(1)

Camacho first alleges that after he filed his charge of discrimination on October 23, 2013--wherein he alleged he was treated less favorably than other employees because of his disability and his Hispanic ancestry—IDOT officials acted out against him. That conduct aggravated the symptoms of his mental illness to the point where it was medically determined he was unfit to work.

Camacho asserts that, like the plaintiff in *Washington*, he was particularly vulnerable because of his bipolar affective disorder. His symptoms became progressively worse between 2012 and July 2014 at which time he suffered panic attacks. Camacho states that his symptoms were exacerbated when he had nothing to do. Both William Kramer and Brad Hessing knew that he was sick. Kramer recommended that IDOT approve Camacho's accommodation request, noting that he "is ill and keeping him in this stressful environment is not helping him or us." Hessing believed Camacho had a mental illness and his symptoms were getting worse in 2014.

Camacho alleges that he could better deal with his symptoms when he was busy at work.  He could focus on work and not think about things which elevated his stress—like being idle.

Camacho claims he was threatened by Hessing's January 2014 "assault," when Camacho alleges Hessing berated him and pointed a finger in his face when Hessing was upset because he believed that Camacho had not called to advise he would be late.  This was a particular stressor for Camacho because of his condition.

Camacho also asserts IDOT's indifference to his requests for accommodation may have been the most harmful acts on its part.  In December 2013, Attorney Carl Draper on Camacho's behalf requested as an accommodation that he be placed on a flex schedule.  Camacho's tardiness problem was attributed to his illness.  Camacho stated that he had difficulty getting out of bed in the morning due to his anxiety.  A flexible work schedule would help address Camacho's tardiness problem.  It took IDOT more than 100 days to respond to that request.  Camacho alleges that during this period, his symptoms were getting worse and he was exposed to more stress because of the increasing scrutiny to his tardiness.

Camacho further claims that IDOT's failure to respond or even acknowledge his March 20, 2014 accommodation request caused him real harm.  Camacho wanted to be removed temporarily from the stress of his work environment while attempting

to bring the symptoms of his mental illness under control. At the time, Hessing thought Camacho's symptoms were getting worse. Kramer also thought Camacho was ill. He believed Camacho was angered by IDOT's failure to grant his request and felt he was being persecuted and treated unfairly. More than 130 days after making the request, Camacho was placed on administrative leave without IDOT responding to his accommodation request and he was later determined to be medically unfit to work. Camacho was placed on disability leave status wherein he effectively received one-half of the income he would have received had he remained on the job.

Camacho alleges that a reasonable jury could believe that if IDOT had timely responded to his request and temporarily placed him in another position while he was attempting to bring the symptoms of his illness under control, the decision to remove him from work would not have been made.

It is undisputed that Camacho engaged in statutorily protected activity by filing a charge of discrimination in October 2013. To the extent that Camacho alleges the failure to act on his March 2014 request for a reasonable accommodation constituted a materially adverse action, the Court disagrees. Even if the collective bargaining agreement did not restrict IDOT from making a temporary transfer of an employee, Michael Prater testified that a temporary assignment was generally not done because that process had previously been abused. Carlos Ramirez also testified

that temporary transfers were not being given in 2015.  While it is unclear why IDOT did not act on the request within 30 days, the Court is unable to find that the failure to do so was a materially adverse action when IDOT was simply acting consistently with its normal procedures.  Additionally, an employee is not entitled to the reasonable accommodation of his choice.  *See Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000).  Accordingly, IDOT's failure to act on Camacho's request was not a materially adverse action.

As for the January 2014 incident with Hessing, it appears Hessing erroneously believed Camacho failed to call to advise he would be late and Hessing acted in an inappropriately confrontational manner.  The Court is unable to conclude that this altercation  between two employees constituted a materially adverse action.

The Court recognizes that Camacho was frustrated by the failure of IDOT to quickly act on Carl Draper's December 2013 accommodation request.  However, the request for a flex schedule was granted even if it was not done expeditiously. Accordingly, this is not a materially adverse action.  Before Camacho's statutorily protected activity in October 2013, IDOT had approved him in August 2013 for FMLA leave to cover intermittent absences, appointments and flare-ups.  The fact that the December 2013 accommodation request was also eventually allowed suggests that he was not treated any differently regarding accommodation requests after he engaged in protected activity.

To the extent Camacho alleges there is a factual dispute regarding whether the decision to remove him from work would have been made if IDOT had timely responded to his March 20, 2014 accommodation request and temporarily placed him in another position while he attempted to bring his symptoms under control, the Court is unable to agree.  The statement is based on speculation.  It is undisputed that Camacho was determined to be unable to perform his duties as a Geologist at the time he was placed on disability leave.

Based on the allegations contained in Count I, the Court is unable to conclude that a materially adverse action was taken against Camacho after he engaged in statutorily protected activity.  Accordingly, the Court concludes that a reasonable jury could not find that IDOT engaged in workplace retaliation against Camacho after he filed his charge of discrimination.  IDOT is entitled to summary judgment on Count I.

(2)

In Count III, the Plaintiff alleges a retaliation claim based on adverse employment action.  Specifically, IDOT retaliated against Camacho when it permanently assigned him to its sign shop in a clerical position which did not require him to use the education and experience he had acquired as a geologist with a master's degree in that field.  Camacho advances two separate claims because of the

reassignment.   He asserts IDOT's reassignment was another act of retaliation because of the October 2013 charge of employment discrimination he had earlier filed with IDOT.   Camacho also alleges in Count II that this reassignment did not reasonably accommodate his disability in violation of the ADA.

Camacho claims that although he incurred no immediate financial loss, his reassignment did implicate the financial terms of his employment.   The sign shop position was in a lower salary grade than his geologist position.   At the time of the reassignment, Camacho was at the top of the salary scale and could advance no further.   As a geologist, however, he was not at the top of the salary scale and could look to future salary increases.

Additionally, Camacho's education and work experience was in the professional field of geotechnical engineering.   He had a master's degree and over 10 years of work experience in that profession.   Following the reassignment, Camacho was a clerk in the sign shop.   He was not able to use the skills he developed as a geologist.   This would result in those skills eroding.   Inevitably, Camacho's prospects in either geology or geotechnical engineering would significantly decline. There is at least a question of fact regarding whether the reassignment was an adverse action.

Camacho acknowledges 23 months elapsed between the date that he engaged in protected activity and the sign shop assignment.  When the adverse employment action occurs more than a year after the charge of discrimination, the timing does not suggest that the employment decision occurred because of the protected activity. *See Nehan v. Tootsie Roll Industries*, 621 F. App'x 847, 852 (7th Cir. 2015); *see also McGuire v. City of Springfield*, 280 F.3d 794, 796 (7th Cir. 2002)  ("[T]iming may offer a clue to causation (or its absence) when an employee charges retaliation: a short gap may suggest a causal link, while a long one undercuts an inference of causation").

Camacho contends that two considerations explain this length of time.  First, during over 14 months of that 23-month period, Camacho was away from work and IDOT had no opportunity to act out against him.  In *McGuire*, the adverse employment action occurred more than a decade after the plaintiff's charge of discrimination.  *See McGuire*, 280 F.3d at 796.  The lengthy delay alone did not defeat plaintiff's claim because it had taken the state 10 years to direct the city to place her in its training program.  *See id*.

Second, Camacho alleges that between December 2013 (less than two months after the charge was filed) and the beginning of his administrative leave, IDOT through a number of acts and omissions acted out against Camacho—as noted in

discussing the retaliation claim alleged in Count I.  Camacho claims, therefore, that the sign shop assignment was merely a continuation of other things done to him.

Upon viewing the record in a light most favorable to the Plaintiff, the Court agrees that the reassignment occurred nine months in actual working time after Camacho's charge of discrimination.  The fact that it occurred nearly two years in real time after the protected activity does not defeat Camacho's claim.  The Court concludes that the amount of time that elapsed neither suggests nor undercuts an inference of causation.

Camacho further asserts IDOT has never explained the process leading to the selection of the sign shop position.  The database IDOT used in finding a position for Camacho identified five positions which Camacho was eligible to hold and were open.  He was not offered any of them.  Rather, IDOT informed Attorney Draper that the sign job position was the only one that would be offered.

Additionally, Camacho claims that the Geologist position in IDOT's District III was a position in his bargaining unit that would have been a good fit for him.  The position was vacant in the late summer of 2015.  Camacho alleges that when Michael Prater informed Carl Draper of the position on August 20, 2015, it was explained to Attorney Draper that the only contingency was to secure the approval of the Special

Master and Prater did not believe that would be an obstacle.  Prater did not explain to Draper why the position was off the table.

IDOT now claims that the position would not have been a good fit for Camacho because it had some supervisory responsibilities.  Prater testified that once the job description was obtained, it was determined that the Geologist III would supervise five or six individuals.  According to Prater, the general consensus was that it would not have been a good fit for Camacho.  When the facts are viewed in a light most favorable to Camacho, however, the Court concludes that there is a genuine issue of material fact as to whether that is the reason as to why Camacho was not offered the Geologist III position.  It appears that the first time IDOT claimed that Camacho was not suited for the position was in defense of this lawsuit.  In his affidavit, Carl Draper states that on August 20, 2015, Michael Prater advised him that he had located a position as a geologist in IDOT's District 6.  Prater did not believe that securing final permission would be a problem.  Draper states that neither Prater nor any other IDOT official advised that the District 6 position was unavailable or that Camacho was not suited for the position.  When Draper was informed that Camacho would be assigned to the sign shop, no explanation was given as to why the District 6 geologist position was not being offered.

IDOT's alleged reason for why the job was not offered to Camacho is certainly plausible.  Based on Draper's discussions with Prater in August 2015,

however, it appeared it was a mere formality that Camacho would be offered the Geologist 6 position.  IDOT did not offer its current explanation until this litigation. Moreover, IDOT has not explained what the supervisory responsibilities were.  The Court concludes that a reasonable jury could reject IDOT's explanation.

Based on the foregoing, the Court concludes there are genuine issues of material fact which preclude the entry of summary judgment in favor of IDOT on Count III.

ADA failure to accommodate claim

In Count II, Camacho alleges IDOT failed to reasonably accommodate his disability by assigning him to a position in the sign shop when a vacant geologist position was available that he was capable of filling.   The ADA prohibits discrimination against a qualified individual on the basis of disability.  42 U.S.C. § 12112(a).  The term "qualified individual" means:

> an individual who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.     42 U.S.C. § 12111(8).

To prevail on a failure to accommodate claim, a plaintiff must show "(1) he was a qualified individual with a disability, (2) his employer was aware of his

disability; and (3) the employer failed to reasonably accommodate his disability." *Youngman v. Peoria County*, 947 F.3d 1037, 1042 (7th Cir. 2020).  If a qualified employee has requested an accommodation, "the ADA requires both parties to engage in an informal interactive process to identify an appropriate accommodation."  *Id.*  Based on Camacho's bipolar affective disorder, the Court concludes that he was disabled.

The Plaintiff had been placed on administrative leave with pay on July 31, 2014.  He was determined not fit for duty after an August 14, 2014 examination.  On October 31, 2014, Dr. Killian found that Camacho was "currently suffering from severe depressive and anxiety symptoms which are clearly severe enough to interfere with his capacity to adequately perform the duties of his position."  He further recommended that Camacho when able to return work in a different bureau at IDOT.

In August and September 2015, Camacho had been away from work for over 12 months.  By then, both his care provider and IDOT's evaluator concurred that his condition had significantly improved to the point that he was capable of returning to work though not to the Unit.  For most of the 12 years he worked at IDOT, Camacho had performed his duties as a geologist in a satisfactory manner.  The problems with his work and attendance arose after his illness was diagnosed.

Upon viewing the evidence in a light most favorable to the Plaintiff, the Court finds there is a legitimate factual question as to whether Camacho would be qualified for the Geologist III position in District 6 upon returning to work. Significantly, IDOT apparently believed Camacho was qualified for that position in August 2015 before determining he was not. As the Court previously noted, IDOT at the time did not provide Attorney Draper with an explanation as to why that apparently changed. The presence of supervisory responsibilities was not mentioned until this litigation. Based on those circumstances, the Court concludes there is factual dispute regarding whether Camacho was a qualified individual with a disability.

The reassignment to a vacant position is an acceptable form of a reasonable accommodation. *See* 42 U.S.C. § 12111(9)(B). "A demotion can be a reasonable accommodation when the employer cannot accommodate the disabled employee in her current or prior jobs or an equivalent position." *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 855 (7th Cir. 2019). An employer may reassign an employee to a lower grade position, but only if there are no vacant equivalent positions for which the individual is qualified. 29 C.F.R. Pt. 1630, App. § 1630.2(o).

Both parties accuse the other of failing to engage in the interactive process. However, a jury could find that on August 20, 2015, Michael Prater informed Carl Draper that he had located a geologist position for Camacho, contingent upon the permission of the Special Master that political considerations were not involved.

44

The parties may have believed that engaging in an interactive process would have been pointless given that a position for Camacho had apparently been secured. Attorney Draper was not given an explanation for why Camacho was no longer considered for the geologist position. Because IDOT would have been the only party with knowledge of this information, there is at least a factual question regarding whether IDOT should have initiated the interactive process whenever it determined that Camacho was no longer a candidate for the geologist position.

Based on the foregoing, the Court concludes that a jury could find that Camacho was assigned to a lower grade position when there was an available vacant and equivalent position for which he was qualified. There is a genuine issue of material fact regarding whether IDOT reasonably accommodated Camacho's disability. The summary judgment motion will be denied as to Count II.

Ergo, the Motion for Summary Judgment of Defendant The Illinois Department of Transportation [d/e 26] is GRANTED in part and DENIED in part.

The Motion is GRANTED as to Count I and DENIED as to Counts II and III.

ENTER: October 8, 2020          FOR THE COURT:

                                            /s/ _Richard Mills_
                                            Richard Mills
                                            United States District Judge

45